[No. E051308. Fourth Dist., Div. Two. Apr. 19, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL LEE BEJASA, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.B.

## COUNSEL

Doris M. LeRoy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Christine Levingston Bergman and Marissa A. Bejarano, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KING, J.—**

### I. INTRODUCTION

Defendant and appellant Michael Lee Bejasa was involved in an automobile collision that seriously injured his passenger. The first police officer at the scene searched defendant and found two syringes, one of which contained methamphetamine. Defendant admitted that the syringes were used to inject methamphetamine and that he was on parole. The police officer handcuffed defendant, told him he was being detained for a possible parole violation, and placed him in the back of his police car. The officer did not give defendant the *Miranda*[1] warnings.

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*).

Upon the arrival of additional officers a short time later, defendant was released from the police car and his handcuffs were removed. The investigating officer conducted an interview and various field sobriety tests (FST) and determined that defendant was possibly under the influence of drugs. The officer then advised defendant he was under arrest. Defendant was not given his *Miranda* rights until he was taken to the police station.

Defendant was charged and convicted by a jury of driving a vehicle under the influence of a drug and personally causing great bodily injury to another (count 1),[2] as well as transporting a controlled substance (count 2).[3] Defendant also pled guilty to driving without a license (count 3).[4] Following a bifurcated court trial, the court found true allegations of prior convictions and two prior strike convictions.[5] The trial court sentenced defendant to consecutive 25-year-to-life sentences on counts 1 and 2. On count 3, defendant received a term of 180 days, to run concurrent to count 1.

On appeal, defendant argues the trial court erred in refusing to suppress evidence of statements made to the police after defendant was handcuffed and placed in a police car prior to being advised of his *Miranda* rights. Among other statements that should have been suppressed, defendant claims that his estimation of time, made during a "Romberg," or modified attention, FST (Romberg test), was testimonial evidence and should have been excluded under *Miranda*. In the published portion of our opinion, we conclude the trial court erred in admitting defendant's custodial statements to the police, including the estimation of time made during the Romberg test. However, because we further conclude the error was harmless, we affirm defendant's conviction.

The remaining issues concern the trial court's sentencing of defendant. Defendant contends the court failed to realize that the "Three Strikes" law does not require consecutive sentencing if the crimes were committed on the same occasion, and the imposition of a consecutive sentence on count 2 was an abuse of discretion. Defendant also argues the court should have stayed the sentence on count 2 pursuant to Penal Code section 654 because the two crimes were committed with a single intent and objective. We address these

---

[2] Vehicle Code section 23153, subdivision (a). The jury also found that in the commission of the offense charged in count 1, defendant personally inflicted bodily injury upon another within the meaning of Penal Code sections 12022.7, subdivision (a) and 1192.7, subdivision (c)(8).

[3] Health and Safety Code section 11379, subdivision (a).

[4] Vehicle Code section 14601.1, subdivision (a).

[5] Penal Code sections 667.5, subdivision (b), 667, subdivisions (a), (c), (e)(2)(A), and 1170.12, subdivision (c)(2)(A).

issues in the nonpublished portion of our opinion. We agree with defendant that the court was unaware of its discretion in determining whether to impose a consecutive or concurrent sentence on count 2, and failed to exercise such discretion. A new sentencing hearing is therefore required, at which the court shall exercise such discretion. Finally, we agree with defendant that the sentence on count 2 must be stayed pursuant to Penal Code section 654.

## II. DISCUSSION

A. *Motion to Suppress Defendant's Statements Made Prior to* Miranda *Warnings*

### 1. *Factual and Procedural Background*

Prior to trial, defendant moved to suppress statements made to police officers after he was handcuffed and placed in the police car and prior to being advised of his *Miranda* rights. The motion was based on the evidence presented at defendant's preliminary hearing. The following is our summary of that evidence.

On the evening of September 19, 2008, defendant was driving a Jeep northbound on State Street in Hemet. Defendant's girlfriend, Stasha Lewellyn, was riding in the passenger seat. At approximately 6:52 p.m., Terri Patterson observed the Jeep as she drove in the southbound slow lane. The oncoming Jeep changed lanes and veered all the way across the street into Patterson's lane. Patterson was unable to avoid the Jeep, and the vehicles collided head on. Lewellyn, who was not wearing a seatbelt, was thrown from the Jeep. As a result, she sustained major injuries.

Hemet Police Officer Derek Maddox was the first police officer to arrive at the scene of the crash. After making sure that the injured parties were being treated by paramedics, Officer Maddox contacted defendant and asked him what happened. Defendant said he had been driving and Lewellyn had been thrown from the Jeep because she was not wearing a seatbelt. Officer Maddox noticed that defendant's eyes were bloodshot. He told defendant to sit on the curb.

Traffic officers were called to continue the investigation. Officer Maddox waited until other officers arrived, then resumed questioning defendant. During this exchange, defendant admitted he was on parole. Defendant consented to a search, during which Officer Maddox found two syringes. One

syringe was empty; the other contained a small amount of liquid that was later determined to be methamphetamine. Defendant admitted he used the syringe to "shoot up methamphetamine." By the time of the search, less than 20 minutes had passed since Officer Maddox arrived on the scene.

Officer Maddox handcuffed defendant and placed him in the back of his police car to await officers from the traffic department. As defendant was being handcuffed, Officer Maddox informed him that "he was being detained for a possible parole violation." Officer Maddox did not give defendant the *Miranda* warnings.

Officer Tony Spates, a Hemet traffic officer, arrived at the scene of the crash at approximately 7:15 p.m. Four other traffic officers responded as well. When Officer Spates arrived, Officer Maddox and another officer briefed him on the collision. Officer Spates then allowed defendant to get out of the police car and removed defendant's handcuffs. Officer Spates proceeded to interview defendant, using a form provided by the Hemet Police Department, in order to determine whether defendant had been driving under the influence. These questions included: "What have you been drinking?," "How much?," "When did you start?," "When did you stop?," "Do you feel the effects of the alcohol?," and "Do you think that you should be driving?" In response to Officer Spates's questions, defendant made incriminating statements regarding his use of drugs.[6]

Officer Spates also administered a number of FST's on defendant, with mixed results. While defendant was able to perform some of the tests to Officer Spates's satisfaction, other test results suggested that defendant was under the influence of a narcotic.

The first FST administered by Officer Spates was the Romberg test. Defendant was asked to stand at attention, close his eyes, tilt his head back, and estimate the passage of 30 seconds. While defendant performed the test, Officer Spates observed defendant's balance and his ability to accurately measure the passage of 30 seconds. Officer Spates testified that defendant leaned slightly and finished counting at 25 seconds. Officer Spates testified

---

[6] The nature of defendant's responses to Officer Spates was not entirely clear at the time of the suppression hearing. As noted above, the motion to suppress was based upon the evidence adduced at the preliminary hearing. At that time, the court sustained defense counsel's objections to the admission of defendant's responses to Officer Spates's questions before they were disclosed. However, when the court asked the prosecutor whether there were admissions or confessions defendant made to Officer Spates, the prosecutor responded: "[T]he statements . . . involving his drug use history[,] . . . that he had shot up, [and] that he did have puncture wounds." At trial, Officer Spates testified that defendant admitted he "had shot up some speed" into his left wrist at approximately 7:00 a.m.

that the result was consistent with the use of a stimulant because it showed that defendant was "moving a little fast."

At the conclusion of the FST's, Officer Spates advised defendant he was under arrest. Defendant's blood subsequently tested positive for methamphetamine.

### 2. The Hearing on the Motion to Suppress

At the hearing on defendant's motion to suppress, defendant argued he had been placed in custody and his statements made to Officer Spates were inadmissible because he had received no *Miranda* warnings. Furthermore, defendant claimed the FST's were also inadmissible testimonial evidence for the same reason.

The trial court rejected defendant's argument and ruled that, in light of the totality of the circumstances, defendant was not in custody. The court found that Officer Maddox was conducting a preliminary investigation and that he had, at most, only one other officer with him. The court reasoned that Officer Maddox detained defendant briefly, until an investigating officer arrived, in order to effectively manage the accident scene. Once Officer Spates arrived, defendant was released and "essentially free to move around." The statements made to Officer Spates were thus not the result of custodial interrogation. The trial court also denied the motion to suppress the FST results based on the conclusions that defendant was not in custody at the time the FST's were administered and defendant's performance on the FST's were "non-testimonial." Therefore, the statements and FST results were ruled admissible.

On appeal, defendant challenges the admissibility of the incriminating statements made to Officer Spates and the estimation of time during the Romberg test.

### 3. Miranda

■ In *Miranda*, the United States Supreme Court held that the Fifth Amendment privilege against self-incrimination prevents the prosecution from using "statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." (*Miranda, supra,* 384 U.S. at p. 444.) The court was concerned that, without these procedural safeguards, the "inherently compelling pressures" of custodial interrogation might induce suspects to speak where they normally would not. (*Id.* at p. 467.)

These procedural safeguards require that a person in custody "first be informed in clear and unequivocal terms that he has the right to remain silent" and "that anything said can and will be used against the individual in court." (*Miranda, supra,* 384 U.S. at pp. 467–469.) Furthermore, a person in custody must be advised of his or her "right to consult with a lawyer and to have the lawyer with him during interrogation." (*Id.* at p. 471.) Finally, the person must be told that "if he is indigent a lawyer will be appointed to represent him." (*Id.* at p. 473.) If these advisements are not made, "no evidence obtained as a result of interrogation can be used against him." (*Id.* at p. 479, fn. omitted.)

In reviewing a trial court's ruling on a motion to suppress evidence based upon a *Miranda* violation, " 'we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' [Citation.]" (*People v. Gamache* (2010) 48 Cal.4th 347, 385 [106 Cal.Rptr.3d 771, 227 P.3d 342].)

4. *Custody*

■ *Miranda* advisements are only required when a person is subjected to custodial interrogation. (*Miranda, supra,* 384 U.S. at p. 444.) A suspect is in custody when a reasonable person in the suspect's position would feel that his "freedom of action is curtailed to a 'degree associated with formal arrest.' [Citation.]" (*Berkemer v. McCarty* (1984) 468 U.S. 420, 440, 442 [82 L.Ed.2d 317, 104 S.Ct. 3138] (*Berkemer*).)

■ Because a *Miranda* warning is only required once custodial interrogation begins, the defendant must necessarily have been in custody in order to assert a violation. "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation . . . ." (*Stansbury v. California* (1994) 511 U.S. 318, 322 [128 L.Ed.2d 293, 114 S.Ct. 1526].) These circumstances must be measured "against an objective, legal standard: would a reasonable person in the suspect's position during the interrogation experience a restraint on his or her freedom of movement to the degree normally associated with a formal arrest." (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1161 [59 Cal.Rptr.2d 587]; see *Berkemer, supra,* 468 U.S. at p. 442; *California v. Beheler* (1983) 463 U.S. 1121, 1125 [77 L.Ed.2d 1275, 103 S.Ct. 3517]; *People v. Stansbury* (1995) 9 Cal.4th 824, 830 [38 Cal.Rptr.2d 394, 889 P.2d 588].)

California courts have identified a number of factors relevant to this determination. While no one factor is conclusive, relevant factors include:

" '(1) [W]hether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning.' " (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403 [42 Cal.Rptr.3d 301]; see *People v. Forster* (1994) 29 Cal.App.4th 1746, 1753 [35 Cal.Rptr.2d 705]; *People v. Lopez* (1985) 163 Cal.App.3d 602, 608 [209 Cal.Rptr. 575.)

Additional factors include: "[W]hether the suspect agreed to the interview and was informed he or she could terminate the questioning, whether police informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement during the interview, and whether police officers dominated and controlled the interrogation or were 'aggressive, confrontational, and/or accusatory,' whether they pressured the suspect, and whether the suspect was arrested at the conclusion of the interview." (*People v. Pilster, supra*, 138 Cal.App.4th at pp. 1403–1404, citing *People v. Aguilera, supra*, 51 Cal.App.4th at p. 1162.)

In denying the defense's motion for suppression of evidence, the trial court concluded that, under the totality of the circumstances, defendant was not placed in custody when he was initially restrained. The trial court characterized the seizure as a "brief detention." The trial court supported this ruling with facts from the record that weigh against an objective determination of custody.

For example, the trial court found that defendant was restrained for only a brief period of time. The record provides ample evidence supporting this conclusion. Officer Maddox responded to the collision at approximately 6:52 p.m. Officer Spates arrived at approximately 7:15 p.m. During this time, Officer Maddox checked for injured parties, then proceeded to question and search defendant before handcuffing him and placing him in the police car. Because of this small window of time, defendant was likely restrained only for a matter of minutes. The brief nature of this restraint tends to show that defendant was merely detained, not in custody.

The trial court also found that, when defendant was restrained, Officer Maddox was accompanied by no more than one other officer. Logically, the fewer the number of officers surrounding a suspect the less likely the suspect will be affected by custodial pressures. However, while this factor would normally weigh against a finding of custody, the argument is less persuasive under the present facts. Here, defendant was restrained when police were shorthanded. However, questioning resumed after more officers arrived.

Another factor identified by the trial court is the fact that Officer Maddox was in "preliminary investigative stages" when he restrained defendant. This also tends to support the determination that defendant was not in custody. Because Officer Maddox was concerned with gathering information regarding what had occurred, rather than questioning defendant as a suspect, it is less likely defendant was exposed to custodial pressures.

While the above facts offer some support for the trial court's determination that defendant was not in custody, other circumstances lend great weight to the argument that a reasonable person would have felt restrained in a manner normally associated with formal arrest. First, prior to being restrained, defendant had incriminated himself in a number of ways. While talking to Officer Maddox, defendant admitted he was on parole. Defendant then consented to a search of his person. That search yielded two syringes, one of which contained a liquid. Defendant further admitted that the syringes were used to "shoot up methamphetamine." At that point, Officer Maddox restrained defendant and informed him that he was being "detained for a possible parole violation."

The fact that defendant offered several incriminating facts and was restrained so quickly thereafter weighs strongly in favor of a finding of custody. A reasonable person in defendant's position would know that possession of methamphetamine and related paraphernalia is a parole violation and a crime, and that arrest would likely follow.

Second, the fact that Officer Maddox advised defendant he was being "detained for a possible parole violation" also weighs in favor of custody. The word "detained," by itself, cannot abrogate the likelihood of custodial pressures. A reasonable person would probably not be comforted by the fact that the officer used the word "detained" and mentioned only a "possible" crime. Here, defendant had just admitted that he was on parole and had been using and carrying methamphetamine. In this context, a reasonable person would understand the officer's statement to mean that he or she was not free to leave.

Even if the above circumstances are insufficient to constitute a level of restraint comparable to formal arrest, the physical restraint that followed crosses that boundary. Defendant was confronted with two of the most unmistakable indicia of arrest: he was handcuffed and placed in the back of a police car. A reasonable person, under these circumstances, would feel restrained to a " 'degree associated with formal arrest.' " (*Berkemer, supra,* 468 U.S. at p. 440.)

In their respondent's brief, the People cite language from *Berkemer* pertaining to "ordinary traffic stops." (See *Berkemer, supra*, 468 U.S. at p. 440.) As the People note, the *Berkemer* opinion states that the "circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police." (*Id.* at p. 438.) The United States Supreme Court concluded that "persons temporarily detained pursuant to such [ordinary traffic] stops are not 'in custody' for the purposes of *Miranda*." (*Id.* at p. 440.)

This was not a typical traffic stop. Defendant was handcuffed and placed in the back of a police car before Officer Spates arrived. A reasonable person in that situation would feel completely at the mercy of the police. As *Berkemer* stated, such a person is "entitled to the full panoply of protections prescribed by *Miranda*." (*Berkemer, supra*, 468 U.S. at p. 440.)

The People also contend it was reasonable for Officer Maddox to place defendant in the back of the police car until other officers arrived. We do not disagree with this point. As the first officer on the scene, Officer Maddox was likely met with chaos. Officer Maddox testified that there were "numerous officers directing traffic" and that police "had to shut down the entire roadway for the helicopter." By restraining defendant and waiting for backup, we have no doubt that Officer Maddox acted prudently.

However, this argument is misdirected. "Whether an individual has been unreasonably seized for Fourth Amendment purposes and whether that individual is in custody for *Miranda* purposes are two different issues. [Citation.]" (*People v. Pilster, supra*, 138 Cal.App.4th at p. 1405.) Here, the issue is not whether the police acted reasonably in detaining or restraining defendant, but rather " 'whether there [was] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' [Citation.]" (*Stansbury v. California, supra*, 511 U.S. at p. 322.)

While a reviewing court must apply a deferential substantial evidence standard to the trial court's factual findings, it must independently determine whether the defendant was in custody. (*People v. Ochoa* (1998) 19 Cal.4th 353, 402 [79 Cal.Rptr.2d 408, 966 P.2d 442]; *People v. Pilster, supra*, 138 Cal.App.4th at p. 1403.) Based on the totality of the circumstances, we hold that defendant was placed in custody when he was handcuffed and placed in the police car.

Furthermore, although defendant was released from the police car and the handcuffs removed by the time Officer Spates questioned him, defendant remained in custody for purposes of *Miranda*. The removal of the restraints was not enough to ameliorate the custodial pressures that likely remained

from the initial confinement. Furthermore, defendant was released from the police car only after numerous officers had arrived at the scene. The ratio of officers to suspect had increased to at least seven to one, thus increasing the custodial pressure on defendant.[7]

### 5. *Interrogation*

██ Interrogation is express questioning or "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301 [64 L.Ed.2d 297, 100 S.Ct. 1682], fns. omitted.)

After releasing defendant from his handcuffs, Officer Spates proceeded to question defendant. The People argue that these questions were of a sufficiently general nature to escape the requirement of a *Miranda* warning. Relying on *People v. Milham* (1984) 159 Cal.App.3d 487 [205 Cal.Rptr. 688] (*Milham*), the People assert that general questions regarding the facts of a crime may be asked of "persons temporarily detained by officers who do not have probable cause to arrest." (*Id.* at p. 500.) These questions are "designed to . . . enable the police to quickly ascertain whether such person should be permitted to go about his business or held to answer charges." (*Ibid.*)

While this principle is sound, it is inapplicable to the facts of this case. For instance, defendant was restrained after Officer Maddox suspected a parole violation. It is likely that Officer Maddox had probable cause to arrest defendant at that point. However, by restraining defendant for further investigation, it is evident that Officer Maddox had decided not to allow defendant "to go about his business." (*Milham, supra,* 159 Cal.App.3d at p. 500.) Furthermore, the questions asked by Officer Spates were not "[g]eneral on-the-scene" questions. (*Ibid.*) The questions were such that the police should reasonably have known they were "likely to elicit an incriminating response." (*Rhode Island v. Innis, supra,* 446 U.S. at p. 301, fn. omitted.) The facts of *Milham* clearly illustrate this distinction.

In *Milham*, the defendant was involved in a car accident that resulted in the death of two of his passengers. (*Milham, supra,* 159 Cal.App.3d 487.) At the scene of the crash, a responding officer approached the defendant and asked whether he was involved in the accident. (*Id.* at p. 499.) The defendant stated that he had been driving the car and that he was worried he had killed his wife. (*Ibid.*) The officer then asked how the accident had happened. (*Ibid.*)

---

[7] According to Officer Huff, five traffic officers responded to the call. These five included Officers Huff, Spates, Gomez, Reinbolt, and Nevarez. Officers Maddox and McGinnis were on the scene when the traffic officers arrived.

The defendant answered that he thought he had " 'blacked out.' " (*Ibid.*) He was later convicted of driving under the influence. (*Id.* at p. 487.)

The defendant appealed his conviction, arguing that the statements made to the officer should have been excluded because no *Miranda* warnings had been given. (*Milham, supra,* 159 Cal.App.3d at p. 499.) The court rejected this argument, explaining that the "[g]eneral on-the-scene questioning" present in the facts did not present a *Miranda* violation. (*Id.* at p. 500.) The court noted that the responding officer had no indication that a crime had been committed. (*Ibid.*) The court also reasoned that, although the officer asked the defendant questions, the officer's "suspicion of criminality" had not yet focused on the defendant. (*Id.* at pp. 500–501.) Finally, the defendant in *Milham* was not in police custody at the time of the questioning. (*Id.* at p. 500.)

Each of the above factors presents a separate point of distinction. First, Officer Spates was briefed by Officer Maddox before he began to question defendant. He knew that defendant was on parole and had been in possession of methamphetamine and syringes. It cannot be said, therefore, that Officer Spates lacked an indication that a crime had been committed. Similarly, it cannot be reasonably argued that defendant was not under suspicion of criminality. Finally, when the questioning began, defendant was already in police custody because of a "possible parole violation."

As the court noted in *Milham,* the "shift from investigatory to accusatory questioning can be very subtle . . . ." (*Milham, supra,* 159 Cal.App.3d at p. 500.) However, this case provides no such subtlety. Here, defendant was asked questions such as, "[w]hat have you been drinking?" and "[h]ow much?" These questions contrast strongly against general questions such as, " '[w]ere you involved in the accident?' " (*Id.* at p. 494.)

Unlike the questions in *Milham,* the questions posed to defendant were such that the police should have known they would likely elicit an incriminating response. Here, the police knew defendant had violated his parole and was carrying methamphetamine. The questions posed to defendant by Officer Spates reflected that knowledge. By the time he contacted defendant, Officer Spates had moved past investigation and into the realm of inculpation. Therefore, defendant was interrogated by Officer Spates.

■ Because defendant was interrogated while in custody, the police were obligated to apprise defendant of his *Miranda* rights. Since defendant was not given his *Miranda* advisements until after Officer Spates's interrogation, evidence of his responses to the interrogation cannot be used against him. (*Miranda, supra,* 384 U.S. at p. 479.) Accordingly, the trial court erred in denying defendant's motion to suppress such evidence.

### 6. *Admission of Romberg Test*

At the hearing on the motion to suppress, defendant challenged the admissibility of evidence that he estimated the passage of 30 seconds under the Romberg test when only 25 seconds had passed. The trial court denied the motion to suppress the FST results based on its conclusion that defendant was not in custody at the time the FST's were administered. The court further ruled that the FST's were "non-testimonial" in nature.

On appeal, defendant argues he was in custody at the time the FST's were administered and that the estimation of time was testimonial because he was asked to "communicate the result of his mental process."[8] Defendant argues, therefore, that the evidence was inadmissible because there had been no *Miranda* warnings.

Because we previously determined that defendant was in custody for the purposes of *Miranda* and that Officer Spates's questions constituted interrogation, the remaining issue is whether the estimation of time made during the Romberg test is testimonial evidence for purposes of *Miranda*.

The Fifth Amendment provides that no "person . . . shall be compelled in any criminal case to be a witness against himself . . . ." (U.S. Const., 5th Amend.) The United States Supreme Court has held that this privilege "does not protect a suspect from being compelled by the State to produce 'real or physical evidence.' " (*Muniz, supra,* 496 U.S. at p. 589, quoting *Schmerber v. California, supra,* 384 U.S. at p. 764.) The privilege "protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." (*Schmerber v. California, supra,* at p. 761, fn. omitted.) "[I]n order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information. Only then is a person compelled to be a 'witness' against himself." (*Doe v. United States* (1988) 487 U.S. 201, 210 [101 L.Ed.2d 184, 108 S.Ct. 2341], fn. omitted.)

Here, defendant contends the estimation of time made during the Romberg test was a communication that divulged his mental process in an incriminating manner, and is therefore testimonial evidence. To support this proposition, defendant relies on *Muniz*.

---

[8] The word "testimonial" is often used in discussion of confrontation clause issues. Here, however, there is no intended reference to "testimonial hearsay." (*Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354].) In this context, the word "testimonial" refers to communication which falls under the Fifth Amendment privilege against self-incrimination, as distinguished from physical evidence, such as the slurring of speech and the taking of blood. (*Pennsylvania v. Muniz* (1990) 496 U.S. 582 [110 L.Ed.2d 528, 110 S.Ct. 2638] (*Muniz*); *Schmerber v. California* (1966) 384 U.S. 757 [16 L.Ed.2d 908, 86 S.Ct. 1826].)

In *Muniz*, the defendant was pulled over by police and asked to perform various FST's. (*Muniz, supra*, 496 U.S. at p. 585.) After performing poorly, the defendant admitted he had been drinking. (*Ibid.*) The police later asked the defendant to state "his name, address, height, weight, eye color, date of birth, and current age." (*Id.* at p. 586.) Finally, the police asked the defendant for the date of his sixth birthday, which the defendant could not answer. (*Ibid.*) The defendant had not been given *Miranda* warnings. (*Muniz, supra*, at p. 586.)

The Supreme Court held that any physical observations made by police were nontestimonial and, therefore, were not gathered in violation of *Miranda*. (*Muniz, supra*, 496 U.S. at p. 583.) For example, in reference to the defendant's slurred speech, the court held that "[r]equiring a suspect to reveal the physical manner in which he articulates words, like requiring him to reveal the physical properties of the sound produced by his voice, [citation] does not, without more, compel him to provide a 'testimonial' response for purposes of the privilege." (*Id.* at p. 592.) Additionally, " 'routine booking question[s],' " such as the defendant's height, weight, eye color, etc., fall outside of *Miranda* protections. (*Muniz, supra*, at p. 601.)

The Supreme Court held, however, that the question regarding the defendant's sixth birthday called for a testimonial response because the question required the defendant to "communicate an express or implied assertion of fact or belief." (*Muniz, supra*, 496 U.S. at pp. 597–599, fn. omitted.) In such circumstances, "the suspect confronts the 'trilemma' of truth, falsity, or silence . . . ." (*Id.* at p. 597.)[9] Because the defendant was in custody and had not been advised of his right to silence, the defendant's only choices were to incriminate himself by admitting that he did not know the date of his sixth birthday or to answer falsely and possibly incriminate himself with an incorrect guess. (496 U.S. at pp. 598–599.) "[H]ence the response . . . contain[ed] a testimonial component." (*Id.* at p. 597.)

The court held that the defendant's inability to answer the question "supported an inference that his mental faculties were impaired, because his assertion (he did not know the date of his sixth birthday) was different from the assertion (he knew the date was [correct date]) that the trier of fact might reasonably have expected a lucid person to provide." (*Muniz, supra*, 496 U.S. at p. 599.) Therefore, "the incriminating inference of impaired mental faculties stemmed, not just from the fact that Muniz slurred his response, but also from a testimonial aspect of that response." (*Ibid.*, fn. omitted.)

---

[9] The *Muniz* court analogized the trilemma of truth, falsity, or silence in the custodial interrogation context to the " ' "cruel trilemma of self-accusation, perjury or contempt" ' [citation] that defined the operation of the Star Chamber, wherein suspects were forced to choose between revealing incriminating private thoughts and forsaking their oath by committing perjury." (*Muniz, supra*, 496 U.S. at p. 596.)

Defendant claims that the Romberg test is "materially indistinguishable" from the sixth birthday question in *Muniz* because defendant, like the defendant in *Muniz*, was "asked to make a calculation, and communicate the result of his mental process." The People, in response, argue that the estimation of time was "analogous to the slurred speech in *Muniz*." The determination of the issue, therefore, depends on whether the Romberg test required a testimonial response or produced only real or physical evidence.

As suggested by the People, the Romberg test results are similar, in some respects, to the physical evidence observed by officers during FST's. The Romberg test is designed to "evaluate[] an individual's internal clock." (*Ramirez v. City of Buena Park* (9th Cir. 2009) 560 F.3d 1012, 1018.) An individual's internal clock is undoubtedly affected, at least in part, by his or her physical condition.

However, the Romberg results are also unlike other purely physical observations, such as loss of balance, redness in the cheeks, or slurred speech. This point is illustrated by the relative complexity of the Romberg test. For example, evidence of slurred speech reflects only an officer's observation of the physical manifestation of the subject's intoxication (i.e., a lack of muscular coordination). Although the subject must speak in order for the observation to be made, the evidentiary value of the observation rests in how the communication was made, not its content.

The Romberg test, on the other hand, implicitly requires the subject to count each passing second, or otherwise estimate the passage of time. Once the subject has counted 30 seconds, the subject must then notify the officer that his estimation is complete. Thus, unlike the slurring of speech observed in *Muniz*, the Romberg test requires the subject to make a mental calculation and communicate that calculation to police.

The probative value of the Romberg test, therefore, lies firmly in the accuracy of the subject's estimation as communicated to police. Because the test requires the suspect to communicate an implied assertion of fact or belief (i.e., that 30 seconds has elapsed), the test is similar to the sixth birthday question in *Muniz*, which called for a testimonial response. (*Muniz, supra,* 496 U.S. at p. 597.) Because he was not told of his right to remain silent, defendant was faced with the choice of stating an incriminating truth (i.e., that he believed 30 seconds had elapsed when that amount of time had not in fact passed) or a falsity (i.e., making a guess as to when 30 seconds had passed).

The communication of a mental calculation also distinguishes the use of the Romberg test from FST's that merely call for the suspect to count or

recite the alphabet. In *Muniz*, for example, the defendant was asked to count while performing walking and balancing FST's. The defendant counted accurately in one test and did not count at all in the other. (*Muniz*, *supra*, 496 U.S. at p. 603, fn. 17.) Because the defendant did not argue that his failure to count was incriminating, the court refused to rule on "whether Muniz's counting (or not counting) itself was 'testimonial' within the meaning of the privilege." (*Ibid.*)

Although the United States Supreme Court and California courts have not addressed the testimonial nature of FST's involving counting, the majority of state courts that have addressed the issue hold that counting (as well as reciting the alphabet) is nontestimonial.[10] In most of these cases, the courts have reasoned that counting or reciting the alphabet does not reveal a person's personal beliefs or knowledge.[11]

However, even assuming, arguendo, that counting is nontestimonial, the inquiry concerning the Romberg test must continue. While the ability to count may reasonably be viewed as indicative of a reflexive or physical process, it is evident that the Romberg test requires a calculation that goes beyond the simple recitation of a memorized sequence. In contrast to reflexive counting, the Romberg test requires the subject to measure the passage of time, and then make an assertion that 30 seconds has passed. It is this assertion that determines the testimonial nature of the Romberg test response. Therefore, we need not decide if counting is testimonial for *Miranda* purposes. The subject of a Romberg test must not only count, but also count at a speed that accurately measures the passage of time.

Here, as in *Muniz*, the suspect was required to make a calculation and communicate the results of that calculation to the police. That communication was an assertion of fact or belief that was relevant for its accuracy, not for the manner in which it was delivered. Therefore, defendant's estimation of time was testimonial evidence. Because the test was administered while defendant was in custody and was reasonably likely to elicit an incriminating response, *Miranda* warnings were required. Because no such warnings were given, defendant's estimation was inadmissible.

---

[10] See *People v. Berg* (1999) 92 N.Y.2d 701 [685 N.Y.S.2d 906, 708 N.E.2d 979]; *State v. Devlin* (1999) 294 Mont. 215 [980 P.2d 1037]; *Vanhouton v. Commonwealth* (1997) 424 Mass. 327 [676 N.E.2d 460]; *State v. Superior Court* (Ct.App. 1987) 154 Ariz. 275 [742 P.2d 286]; *State v. Maze* (1992) 16 Kan.App. 527 [825 P.2d 1169]; *State v. Zummach* (N.D. 1991) 467 N.W.2d 745; *People v. Bugbee* (1990) 201 Ill.App.3d 952 [147 Ill.Dec. 381, 559 N.E.2d 554]; *Gassaway v. State* (Tex.Crim.App. 1997) 957 S.W.2d 48. Contra, *Allred v. State* (Fla. 1993) 622 So.2d 984; *State v. Fish* (1995) 321 Or. 48 [893 P.2d 1023].

[11] See *People v. Berg*, *supra*, 708 N.E.2d 979; *State v. Devlin*, *supra*, 980 P.2d 1037; *Vanhouton v. Commonwealth*, *supra*, 676 N.E.2d 460; *State v. Superior Court*, *supra*, 742 P.2d 286; *State v. Maze*, *supra*, 825 P.2d 1169; *State v. Zummach*, *supra*, 467 N.W.2d 745; *People v. Bugbee*, *supra*, 559 N.E.2d 554.

### 7. Prejudice

Although the court erred in failing to exclude the challenged statements, the error was not prejudicial.

Federal constitutional error is not prejudicial and does not require reversal where the reviewing court properly concludes it was "harmless beyond a reasonable doubt." (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].)

The first statement challenged on appeal is defendant's statement to Officer Spates that he had consumed alcohol. This statement was harmless because the focus of the trial was on defendant's possession and use of methamphetamine, not alcohol. Indeed, the jury heard defendant's preliminary alcohol screening returned a 0.00 percent reading. Furthermore, Officer Spates testified that he "excluded alcohol" as a suspected intoxicant after performing the preliminary alcohol screening. It is clear from the record that defendant was convicted based on his consumption of methamphetamine. The fact that defendant said he consumed alcohol could not reasonably have affected the jury's verdict.

The second challenged statement was defendant's statement that he should not have been driving because he did not have a license. This statement was harmless as well. Defendant pled guilty to driving without a license and, at trial, his counsel stated that driving without a license "was never an issue." While it may be argued that the suspension or revocation of a license may suggest a past crime, here defendant was not asked why his license was revoked. Again, testimony focused on whether defendant was under the influence of methamphetamine. Therefore, this statement is unlikely to have influenced the jury.

Defendant also challenges the admissibility of his declaration that "he had shot up some speed" and that he had "injected it into his left wrist." These statements, although clearly relevant to the issue of defendant's intoxication, were harmless as well. At trial, a great body of evidence was presented establishing defendant's use of methamphetamine. For example, the jury heard that defendant was found to be in possession of methamphetamine and syringes. Defendant admitted to Officer Maddox that the syringes were used "[f]or shooting up methamphetamine." The jury also heard Officer Spates's testimony regarding defendant's physical appearance (including the puncture wound on defendant's wrist) and his poor physical performance during sobriety tests. In addition, the jury heard that defendant's blood was found to contain 198 nanograms of methamphetamine—an amount an expert testified "is consistent with an abuse level."

In contrast to the strong evidence of defendant's intoxication, the results of the Romberg test were not necessarily even incriminating. For example, a toxicologist testified with respect to the Romberg results: "It's not too far off from actual time. It's heading in a fast direction." In addition, Officer Spates admitted that if two people counted to 30, a five-second disparity could be explained by the simple fact that one person "counted a little faster." Although the Romberg evidence supports an inference that defendant was under the influence of a stimulant, it is clear that the inclusion of this evidence, even in conjunction with the other statements made to Officer Spates, was overshadowed by the properly admitted evidence supporting a finding of intoxication.

Defendant argues, however, that because there was conflicting evidence presented at trial on the issue of impairment, it is likely that the statements were relatively influential. While it is clear that these statements are relevant to defendant's use of methamphetamine, when viewed in the context of the entire record, it is improbable they influenced the jury. The jury heard that defendant drove a vehicle into oncoming traffic. He was in possession of methamphetamine and drug paraphernalia. He exhibited various physical indications of intoxication. Methamphetamine was found in defendant's blood at levels indicating abuse. Finally, the jury heard expert testimony that a person "would [not] be able to safely operate a motor vehicle" "based on the levels [of methamphetamine] detected in this case, the driving pattern . . . , as well as the eyelid flutter and the rebound dilation."

Under these facts, we hold that the erroneous admission of defendant's statements to police, and the results of the Romberg test, was "harmless beyond a reasonable doubt." (*Chapman v. California, supra,* 386 U.S. at p. 24.)

B. *Sentencing Issues**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III.   DISPOSITION

Defendant's conviction is affirmed. Following remand, the court shall hold a new sentencing hearing to determine, in its discretion, whether to impose concurrent or consecutive sentences as to counts 1 and 2. Regardless of how the court exercises such discretion, the court shall direct that the sentence on

*See footnote, *ante,* page 26.

count 2 be stayed pursuant to Penal Code section 654. The trial court is directed to amend the minute order and the abstract of judgment to reflect the stay of the sentence on count 2, and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

Richli, Acting P. J., and Codrington, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 18, 2012, S202831.