Filed 6/24/14  P. v. Le CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>NGHIEM VAN LE,<br><br>    Defendant and Appellant. | G047868<br><br>(Super. Ct. No. 12NF0242)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, David A. Hoffer, Judge.  Affirmed as modified.

Kenneth H. Nordin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Chief Assistant Attorney General, Peter Quon, Jr., Assistant Attorney General, and Linh Lam, Deputy Attorney General, for Plaintiff and Respondent.

A jury convicted Nghiem Van Le of driving while under the influence of alcohol (Veh. Code, § 23152, subd. (a); count 1), driving with a blood-alcohol level of 0.08 percent or higher (Veh. Code, § 23152, subd. (b); count 2), and driving on a suspended license (Veh. Code, § 14601.2, subd. (a); count 3).

The trial court found true allegations Le drove with a blood-alcohol level of 0.15 percent or more (Veh. Code, § 23578), had three prior felony convictions for driving while under the influence (Veh. Code, § 23578), a prior "strike" within the meaning of the "Three Strikes" law, and served two prison terms (Pen. Code, § 667.5, subd. (b)).

The trial court imposed a total sentence of five years, consisting of four years for count 1 (twice the midterm), plus one year for one of the prison priors. The trial court struck the remaining prison prior for sentencing only, stayed sentence for count 2 pursuant to Penal Code section 654, and suspended sentence for count 3.

Le challenges the sufficiency of the evidence to prove count 2, driving with a blood-alcohol level of 0.08 or greater, and the Vehicle Code section 23578 finding with respect to counts 1 and 2. He further asserts the trial court improperly gave CALCRIM No. 2111, an instruction on permissive inference. He also claims the trial court erred by suspending imposition of sentence on count 3 rather than staying the imposition of sentence. The Attorney General concedes the court should have stayed sentence on count 3, and we modify the judgment accordingly. In all other respects, the judgment is affirmed.

**FACTS**

*1. Arrest*

Around 4:30 p.m. on January 23, 2012, Anaheim Police Officers Trang Pham and Kevin Pedrosa saw Le sitting in the driver's seat of a car stopped at a stoplight. Le did not immediately proceed through the intersection when the light turned green. Pham noticed Le's hesitation, and the two officers drove ahead and waited for Le. When Le drove by the officers, they pulled in behind him and activated their overhead lights.

2

It took a few minutes for Le to pull over. Pedrosa testified, "there was this like stop and go kind of thing inside the parking lot. It was several minutes of that before he finally decided he was going to stop for us." Pham testified that he believed Le was simply not paying attention. After 10 minutes, Le finally stopped his car.

When Pham and Pedrosa approached Le's car, they noticed that Le was slumped over to his right and appeared to be passed out. His eyes were closed and he was motionless. When Le opened his eyes, they were red and droopy, his speech was slurred, and he mumbled when he tried to talk. Le staggered out of his car, and had to use the car for support.

Pedrosa helped walk Le to a nearby curb and asked him to sit down. When he helped Le walk, Pedrosa smelled alcohol on Le's breath and body. Pedrosa and Pham asked Le about his recent activities and any medical conditions he may have, including medications he might have taken. Le denied drinking any alcohol that night. Le told the officers that he got six hours of sleep the night before, he had no physical defects or medical conditions, and he denied being sick or injured, diabetic or epileptic, or on any medicines or drugs. Based on the officers' observations, they decided to have Le perform field sobriety tests.

About 40 minutes after they had first seen Le, the officers administered a series of field sobriety tests.[1] Le appeared to understand their directions, and he was told

---

[1] The officers asked Le to perform the Romberg test, the walk and turn test, and the one-legged stand. In the Romberg test, the licensee is asked to stand at attention, close his eyes, tilt his head back, and estimate the passage of 30 seconds. (*People v. Bejasa* (2012) 205 Cal.App.4th 26, 33.) In the walk and turn test, the individual is asked to walk heel to toe in a straight line for nine steps, then turn around and walk back heel to toe. (See *People v. Mathson* (2012) 210 Cal.App.4th 1297, 1303, fn. 3.) The one-legged stand required Le to stand with his feet together and his arms at his sides, then to raise one of his feet 6 to 12 inches high, keeping his foot parallel to the ground and his knees straight. Once Le achieved this position, the officer directed him to look at his toes and count from 1,001 up until told to stop.

to ask questions if he did not.  According to Pham, Le failed every field sobriety test administered.

During the Romberg test, Le "swayed back and forth and side to side about two to three inches," and he had to be reminded to keep his eyes closed.  Le underestimated the passage of time, stating he believed 30 seconds had passed when, in fact, only 21 seconds had actually elapsed.  On the walk and turn test, Le deviated from a straight line several times, took the wrong number of steps, turned improperly, and used his arms to help him balance.  During the one-legged stand test, Le did not raise the foot that the officer instructed him to raise, he was unable to stand on one leg 30 seconds without swaying back and forth and he was unable to use his arms for balance.  The officers did not administer the finger-to-nose test[2] for fear Le would lose his balance and be injured, nor did they administer the horizontal gaze nystagmus test, although this was not out of concern for Le's safety.[3]

Based on the totality of the circumstances, including Le's behavior, his performance on the field sobriety tests, his driving, and the obvious signs and symptoms of intoxication he exhibited, Pham formed the opinion that appellant was "impaired" for the purpose of driving.

Le was placed under arrest for suspected driving under the influence and his car searched.  The officers found two vodka bottles on the floor behind the front passenger seat.  One bottle was empty.  The other bottle was half empty.

---

[2] The finger-to-nose test requires an individual to place his feet together, tilt his head back, lift one finger (left or right) and touch the tip of his nose and then put his hand down.

[3] "Nystagmus' is an involuntary rapid movement of the eyeball, which may be horizontal, vertical, or rotary.  [Citation.]  An inability of the eyes to maintain visual fixation as they are turned from side to side (in other words, jerking or bouncing) is known as horizontal gaze nystagmus, or HGN.  [Citation.]" (*People v. Ojeda* (1990) 225 Cal.App.3d 404, 406.)

4

A technician at the Anaheim Police Department drew Le's blood at 6:15 p.m. Later testing revealed that Le had at 0.175 blood-alcohol level at the time of the blood draw. Le was approximately five feet, seven inches tall and weighed approximately 180 pounds.

*2. Expert Testimony*

Erin Nixt, a forensic scientist at the Orange County crime laboratory, testified as the prosecution's expert. Nixt explained that alcohol is absorbed through the stomach and small intestines during the first phase of alcohol absorption. During the second phase, the distribution phase, the alcohol is "pumped around to the rest of the body along with the blood." In the third phase, the elimination phase, alcohol is removed from the bloodstream, primarily by metabolism in the liver, but also by excretion in breath and urine.

There is no average rate of absorption of alcohol but, in general, a person reaches maximum blood-alcohol concentration within 15 to 30 minutes after he has stopped drinking, if he or she has an empty stomach. On the other hand, a large meal can delay absorption. And, in general, blood alcohol is eliminated at the rate of about 0.015 percent per hour. Of course, a blood-alcohol test only establishes the amount of alcohol in the blood at the time of the test.

In Nixt's opinion, "most people will be impaired for the purposes of driving at a .05 [blood-alcohol content level]. That means that they may be mentally impaired or may be mentally and somewhat physically impaired at that level."

The prosecutor asked Nixt to assume a "hypothetical male weighing 180 pounds," a blood-alcohol test result of 0.175 percent roughly 90 minutes after the male is seen driving. In addition, the prosecutor asked Nixt to assumed that while in his car, the male had been observed slumped over to his right side in the driver's seat of his car, delayed moving forward when the light turned green, did not immediately stop when the police initiated a traffic stop, had red, watery eyes, slurred speech, and an odor of alcohol

about his breath and person, and who was also mumbling, stumbling, swaying, and could not follow directions or adequately perform field sobriety tests, is consistent with being impaired when he drove 90 minutes earlier.

Nixt admitted she could not state with absolute certainty what Le's blood alcohol level was when he was driving because she did not know when he stopped drinking. Nevertheless, Nixt opined that a male of Le's physical stature would have to consume between nine and ten standard drinks to achieve a blood-alcohol level of 0.175 percent.

*3. Defense Case*

*a. Expert Testimony*

Forensic toxicologist Darrell Clardy testified that the horizontal gaze nystagmus test is usually the first test done by police officers to determine impairment, and the test is not dangerous to give to intoxicated persons because it can be performed with the subject sitting down or standing up. He agreed with Nixt's explanation of the three phases of alcohol absorption.

Clardy testified that people who drink on an empty stomach reach their peak level of blood-alcohol content between 30 minutes to two and one-half hours whereas if there is food in the person's stomach, the peak level of blood-alcohol content happens between 90 minutes and four hours. In Clardy's opinion, it was not possible to determine what stage of absorption Le was in at the time he drove. Nevertheless, Clardy opined, with "reasonable probability," that Le was still absorbing alcohol at the time the field sobriety tests were performed. And, in Clardy's opinion, "most of us aren't going to be impaired until we're above the .10 [percent level of blood-alcohol content]."

Clardy also testified that poor performance on field sobriety tests could be the result of intoxication, sleep deprivation, or poor hand-eye coordination. He also challenged the efficacy and reliability of field sobriety tests.

Dr. Martha Rogers, a specialist in forensic psychology, also testified for the defense. She administered a number of tests to Le, and explained the results. According to Rogers, Le scored very low for verbal comprehension, perceptual reasoning, working memory, and mental processing speed. She testified that Le had been shot in the head in 1993, which left Le "with some significant handicaps." In fact, Rogers testified that the 1993 left brain injury rendered Le unable to use his right hand, and caused some impairment to the right side of his body. She also testified that Le "has some kind of visual handicap," and he has difficulty with divided attention tasks.

**DISCUSSION**

*1. Sufficiency of the Evidence to Prove Driving With a 0.08 BAC or Higher*

Le asserts the prosecution failed to produce sufficient evidence to support the conviction on count 2. He argues that "no rational fact finder could have found [him] guilty" of driving with a blood-alcohol level of 0.08 or higher. We disagree.

"'"'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.'"'" (*People v. Burney* (2009) 47 Cal.4th 203, 253.) We presume all facts in support of the judgment which could be deduced from the evidence, and do not reweigh the evidence or redetermine credibility. (*People v. Wilson* (2008) 44 Cal.4th 758, 806.) Reversal is warranted only if there is no substantial evidence to support the conviction under any hypothesis. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Here, the officers' observations of Le's demeanor and behavior, and his lackluster performance on the field sobriety tests, all of which occurred contemporaneously with Le's arrest, showed a significant level of impairment at that time. Although Nixt could not give a precise estimate of Le's blood-alcohol level at the time of driving, she did testify Le's performance of the field sobriety tests, and poor

7

balance, appearance, and demeanor, were all consistent with a blood-alcohol level of around 0.17 percent. And, she testified that while there is no standard rate for absorption, the accepted average rate of elimination of alcohol is about 0.015 percent per hour.

Even the defense expert conceded that Le's performance could be the result of significant impairment consistent with a 0.17 blood-alcohol level. However, in Clardy's opinion, Le's blood alcohol was rising while he performed the field sobriety tests, which means he did not drive with a blood-alcohol level of 0.17. With respect to Rogers's testimony that Le had mental and physical impairments that affected his performance on the field sobriety tests, the jury was free to reject her testimony and accept the testimony of the arresting officers. The officers said Le claimed no physical impairment or medical condition when they questioned him. In short, the jury was free to reject Le's defense and accept the prosecution's evidence.

However, we believe the real flaw in Le's claim is that the prosecution was required to establish a precise blood-alcohol level at the time he drove. Rather, the prosecutor's burden was merely to prove Le's blood-alcohol level was *in excess of 0.08 percent* at the time he drove. While it is possible Le ingested alcohol immediately before the officers saw him stopped at a green light, i.e., because of the empty and half-empty vodka containers under the driver's seat, that evidence is not conclusive. There is no evidence the bottles were accessible to him while driving.

Moreover, even if the jury believed Le had continued his drinking until just minutes before the accident, i.e., he was still in the absorption phase, that fact alone would not preclude the jury from determining Le had achieved a blood-alcohol level of 0.08 percent or more at the time he drove. Given the expert's testimony that the absorption of alcohol into the bloodstream happens "fairly rapidly," the jury could easily conclude that the majority of the alcohol Le ingested had been fully absorbed when he drove. In fact, the only way Le's blood-alcohol level would increase after his arrest is if

he had consumed alcohol just before or after the officers detained him. This scenario is implausible and unsupported by the record.

In any event, the permissive inference authorized by Vehicle Code section 23153 is sufficient to support the jury's conclusion in the circumstance of this case. That statute expressly authorizes a jury to draw an inference that a person whose blood test reveals a blood-alcohol level of at least 0.08 percent within three hours of driving also had a level of 0.08 percent or more at the time of driving. (Veh. Code, § 23153, subd. (b).) Le relies on *People v. Beltran* (2007) 157 Cal.App.4th 235 (*Beltran* ) to argue application of the inference is improper in his case, but the circumstances of *Beltran* are distinguishable.

In *Beltran,* the defendant's blood test revealed a blood-alcohol level of exactly 0.08 percent 45 minutes after he was cited, and then a second test, administered 30 minutes later, revealed his blood-alcohol level had risen 0.10 percent. Based upon that rising level, the court noted "both parties presented expert testimony which suggested that appellant's [blood-alcohol level] was below the legal limit at the time he was driving." (*Beltran*, *supra*, 157 Cal.App.4th at p. 239.) Under those facts, the appellate court concluded that allowing the jury to rely solely on the permissive inference to establish a fact inconsistent with the evidence adduced at trial was improper because "'"'the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury.'"'" (*Id.* at p. 245.)

On the other hand, the *Beltran* court also held that reliance on the permissive inference is not a problem in a case where the proven facts were not inconsistent with the inference. The court stated, "[W]hen used in appropriate cases, permissive inferences do not shift the burden of production or lower the prosecution's burden of proof. Because they may or may not be drawn by the jury, they do not operate in an unconstitutionally pernicious manner." (*Beltran*, *supra*, 157 Cal.App.4th at p. 244.)

9

Here, unlike in *Beltran*, the evidence was consistent with the permissive inference. Le had a blood-alcohol level of 0.17 percent 90 minutes after the stop, which is nearly twice the legal limit. Without knowing when he last consumed alcohol, both sides were free to argue their respective positions on whether Le was in the absorption phase or the elimination phase. The fact that other evidence arguably undercut the inference in this case, does not, as *Beltran* makes clear, preclude its use: "[a permissive inference] may be given regardless of whether there is other evidence admitted at trial 'rebutting' the inference." (*Beltran*, *supra*, 157 Cal.App.4th at p. 244.)

Under these circumstances, the jury was entitled to rely on the permissive inference authorized by Vehicle Code section 23153, subdivision (b). The permissive inference, together with the other evidence presented at trial, is sufficient to support the jury's determination that Le drove with a blood-alcohol level of at least 0.08 percent. Using the same analysis and set of facts, we conclude the evidence is also sufficient to support the jury's finding Le drove with a blood-alcohol level of 0.15 or above.

## 2. *The Jury Instructions*

During a conference on jury instructions, Le objected to the trial court instructing the jury with CALCRIM No. 2111. CALCRIM No. 2111 contains the "permissive inference" discussed above, and allows the jury to infer a person drove a vehicle with a blood-alcohol level of 0.08 percent or more if a blood sample taken within three hours of driving records a blood-alcohol level of 0.08 percent or more. (*Beltran*, *supra*, 157 Cal.App.4th at pp. 240, 242.)

CALCRIM No. 2111 provides, in pertinent part, "If the People have proved beyond a reasonable doubt that a sample of the defendant's (blood/breath) was taken within three hours of the defendant's [alleged] driving and that a chemical analysis of the sample showed a blood alcohol level of 0.08 percent or more, you may, but are not required to, conclude that the defendant's blood alcohol level was 0.08 percent or more at the time of the alleged offense." Because CALCRIM No. 2111 is a permissive inference

10

not a mandatory presumption, it may be given regardless of whether there is other evidence at trial which rebuts the inference. (*Beltran*, *supra*, 157 Cal.App.4th pp. 242-244.)

Le also argues CALCRIM No. 2111 should not have been given because Clardy's testimony was inconsistent with the permissive inference. Again we disagree.

Vehicle Code sections 23152 and 23153 provide, "it is a rebuttable presumption that the person had 0.08 percent or more, by weight, of alcohol in his or her blood at the time of driving the vehicle if the person had 0.08 percent or more, by weight, of alcohol in his or her blood at the time of the performance of a chemical test within three hours after the driving" (Veh. Code, §§ 23152, subd. (b), 23153, subd. (b)). In addition, Vehicle Code section 23610, subdivision (a)(3), sets forth a rebuttable presumption that "[i]f there was at [the time of the test] 0.08 percent or more, by weight, of alcohol in the person's blood . . . the person was under the influence of an alcoholic beverage at the time of the alleged offense."

Theses permissive inferences are appropriate where the conclusion the jury is allowed (but not required) to draw is """"one that reason and common sense justify in light of the proven facts before the jury.""" (*Beltran*, *supra*, 157 Cal.App.4th at p. 245.) Here, the conclusion that Le drove while under the influence of alcohol is nearly inescapable. His speech was slurred, his eyes were watery, and he reeked of alcohol. He failed every field sobriety test given, and the officers did not give one test for fear Le would injure himself. His subsequent blood test revealed he had ingested between nine and 10 drinks before he was stopped. These facts support giving CALCRIM No. 2111.

In any event, even if there were an instruction error, we would deem that error harmless. (See *Beltran, supra,* 157 Cal.App.4th at p. 247 [applying harmless error analysis to jury instructions "erroneously allowing permissive inferences"]; *People v. Flood* (1998) 18 Cal.4th 470, 505-507 [applying harmless error analysis to jury instruction which omitted an element of the crime].) This is not a particularly close case.

11

Le appeared very intoxicated to Pham and Pedrosa when they stopped him.  They had to help him walk, and he smelled like alcohol.  His appearance and performance on the field sobriety tests, coupled with the results of the blood-alcohol test administered about 90 minutes later, is sufficient to demonstrate that any error in the jury instructions was harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18.)

## DISPOSITION

The clerk of the superior court is directed to modify the abstract of judgment to reflect that punishment for count 3 is imposed but stayed, not suspended.  In all other respects, the judgment is affirmed.


THOMPSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOORE, J.