Filed 6/27/22  P. v. Franklin CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DANNY WILLIAM FRANKLIN,<br><br>    Defendant and Appellant. | C092870<br><br>(Super. Ct. No. 16F2611) |

Layton Cesario, a passenger in defendant Danny William Franklin's vehicle, died when defendant crashed his vehicle while driving under the influence of alcohol (DUI). After hearing evidence that defendant had a prior DUI conviction, was aware of the risk to life, and consciously disregarded that risk, a jury found defendant guilty of implied malice second degree murder of Cesario (count 1).  (See *People v. Watson* (1981) 30 Cal.3d 290.)  The jury also found defendant guilty of two DUI-related Vehicle Code

1

offenses. The trial court imposed a sentence of 15 years to life on count 1, and stayed the remaining terms pursuant to Penal Code section 654.[1]

On appeal, defendant argues (1) admission of statements that he made to a peace officer at the scene of the crash violated his right against self-incrimination under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*); (2) trial counsel provided ineffective assistance by failing to introduce certain evidence in support of the *Miranda* claim; (3) the trial court erred by failing to provide sua sponte instructions to the jury; (4) the trial court erred by denying defendant's posttrial motion for juror contact information; and (5) if we affirm the convictions, we must remand for resentencing due to recent amendments to section 654.

We reject defendant's challenges to his convictions, but agree the matter must be remanded for the trial court to consider whether to exercise its new discretion under section 654.

## FACTUAL AND PROCEDURAL BACKGROUND

At approximately 6:00 p.m. on April 23, 2016, defendant was the passenger, and Cesario the driver, as they left a casino in defendant's pickup truck. Before they left, defendant consumed three alcoholic drinks at the casino.

Around 7:30 p.m., the men entered a restaurant where Cesario's girlfriend worked. Each man ordered an alcoholic drink. When they left the restaurant, they argued in the parking lot, as Cesario "begg[ed] [defendant] to let him drive." Around 8:30 p.m. a passing driver saw the truck on its side, off the road, and called 911.

A firefighter who responded to the scene heard defendant "saying he had F'd up; that he had killed his buddy; he was going to be in big trouble." A sheriff's deputy who responded to the scene observed defendant "resting up against the back of one of the

---

[1] Undesignated statutory references are to the Penal Code.

2

medic vehicles in the roadway." Defendant "appeared to be unsteady on his feet" while standing, and "sway[ed] from side to side while he was seated up against the medic vehicle." Defendant's speech was "slow and slurred," and he "took a very long time locating . . . and removing . . . from his wallet" "his California driver's license or I.D. card."

A California Highway Patrol (CHP) officer who responded to the scene found defendant "seated on the rear bumper of an ambulance . . . being treated by medical personnel." The CHP officer "approach[ed] [defendant], engaged him in conversation." The officer testified that he did not notice any signs or symptoms of alcohol intoxication when he first encountered him, but once defendant started talking to him, he could "clearly smell the strong odor of an alcoholic beverage coming from his breath." The officer also noticed that defendant's speech was "slow and slurred," his eyes were "red and watery and swollen," and defendant was "unsteady on his feet."

Defendant told the CHP officer that he was driving the truck when it crashed.

The CHP officer asked defendant if he consumed alcohol that night. Defendant said he "had consumed . . . three mixed drinks [with] vodka" at the casino, and had not had anything to drink after the crash. After defendant had been checked out by medical personnel, the CHP officer asked him to perform field sobriety tests and defendant refused. The CHP officer also asked defendant to do a preliminary alcohol screen test, to which defendant also declined. The CHP officer then asked defendant whether he "knew that drinking and driving can result in serious bodily injury or death to another person?" Defendant "said 'yes, sir,' he understood." The CHP officer then asked, "You did and you decided to do it anyway?" Defendant replied, "Yes, sir, I did." A video of this interaction was admitted into evidence at trial.

A "multidisciplinary accident investigation team" (which included an engineer, a mechanic, and at least one CHP officer) later concluded that defendant was driving the

pickup truck at a speed of about 81 miles per hour before the crash. The posted speed limit where the crash occurred was 40 miles per hour.

A sample of defendant's blood that was drawn about two hours after the crash had a blood-alcohol content of .173 percent, which was "over twice the legal limit," the CHP officer testified. A person with a blood-alcohol content of .173 percent would be "clearly unable to operate a motor vehicle safely," he explained. A blood sample collected from Cesario after his death reflected a blood-alcohol content of .062 percent; less than half the concentration of alcohol in defendant's blood.

On April 27, 2016, defendant was charged in a complaint, later deemed an information, with one misdemeanor count and four felony counts, including count 1, second degree murder (Pen. Code, § 187, subd. (a)), count 2, proximately causing bodily injury to another while driving under the influence of alcohol within 10 years of a prior DUI conviction (Veh. Code, §§ 23153, subd. (a), 23560), count 3, proximately causing bodily injury to another while driving a vehicle with a blood alcohol content of .08 percent or more within 10 years of a prior DUI conviction (Veh. Code, §§ 23153, subd. (b), 23560), count 4, hit and run causing death (Veh. Code, § 20001, subd. (a)), and count 5, driving when privilege to drive was suspended or revoked for a prior DUI conviction (Veh. Code, § 14601.2, subd. (a)). The information also alleged enhancements pursuant to Penal Code section 12022.7 (inflicting great bodily injury) and Vehicle Code section 23578 (having a blood-alcohol content of .15 percent or higher).

I

*Motion to Exclude Statements*

Prior to trial, defendant filed a motion in limine to exclude statements that he made to the CHP officer after the crash, arguing that—before he received any *Miranda* warning—he "was in custody at the time [the CHP officer] asked him if he knew drinking and driving was dangerous and if he chose to do it anyway."

4

Defendant asserted the following facts in his pleading: "[L]aw enforcement was dispatched to a traffic collision" at 8:34 p.m. A deputy sheriff who "arrived on scene at approximately 8:57 PM" found defendant "seated on the rear step of [an] ambulance." Defendant told the deputy sheriff that he was the driver of the pickup truck that crashed. The deputy sheriff "asked [defendant] for identification and [defendant] provided his California DMV ID." The deputy sheriff "then instructed" a second deputy sheriff "to stand by with [defendant] while" the first deputy sheriff "continued to contact other witnesses."

A CHP officer "arrived on scene at approximately 9:20 PM," and learned from a "Sgt. Stonehouse . . . that . . . Sheriff's Deputies had detained [defendant] and he was being treated by . . . medical personnel." The CHP officer asked defendant "several questions about the accident, where he was going and coming from, and how much he had to drink. [Defendant] advised [the CHP officer] that he had consumed three mixed drinks. [The CHP officer] also noted [defendant] had objective symptoms of alcohol intoxication . . . ."

"[The CHP officer] then was notified that [defendant] had been medically cleared. He asked [defendant] to walk over to his patrol vehicle. . . . When [defendant] arrived at the patrol vehicle, [the CHP officer] asked if [defendant] would perform field sobriety tests. [Defendant] refused . . . .

"[The CHP officer] then asked [defendant] if he was aware that drinking and driving could possibly result in serious bodily injury or death to another person and [defendant] stated, 'yes sir.' [The CHP officer] then asked [defendant], 'so knowing that you chose to do it anyway?' [Defendant] replied, 'you know . . . I did.' [Defendant] was then placed under arrest."

The prosecution filed an opposition to defendant's motion, arguing defendant "was not in custody" when he made the "*Watson* admission." Relevant here, the prosecution asserted that "[d]uring the[ ] conversation" with the CHP officer, defendant

5

"was not arrested or handcuffed." The prosecution did not dispute any of the facts from defendant's recitation.

At the hearing on the motions in limine, the trial court denied defendant's motion to exclude his statements to the CHP officer.

Before the trial court ruled, the parties made oral argument on the motion.

Defense counsel argued defendant was "detained because [the first deputy sheriff] tells [the second deputy sheriff] to standby with [defendant] and he is not allowed to leave the scene essentially. Multiple other law enforcement officers arrive. . . . [T]hey take his I.D. so a reasonable person . . . would not feel free to leave. They start asking him the standard DUI questions. . . .

"Throughout this whole time [the CHP officer] . . . is making observations of [defendant] that include the slow speech, odor of alcohol . . . , but then it shifts from a DUI investigation into a murder investigation when they start asking him questions and go to the very heart of this case, and the very heart of what the prosecution has to prove . . . , and [the CHP officer] asked those pointed questions when [defendant] was essentially already de facto arrested due to the totality of the evidence . . . . So . . . *Miranda* is triggered at this point prior to those questions being asked, and . . . because [defendant] was not given his *Miranda* warning, those statements must be excluded."

The prosecutor argued that, when he made the incriminating statements, "defendant was not in handcuffs. He was not under arrest. He wasn't arrested until afterwards. He had been at the crime [scene] for over an hour, not in handcuffs."

The trial court explained its ruling denying defendant's motion: "[I]ronically I think our argument might be a little bit more compelling if the defendant would have cooperated with law enforcement, if they would have gone through the whole [field sobriety tests] . . . . If it was abundantly clear he was wasted . . . there would be a more compelling argument that . . . he knew he was in big trouble and is in custody, but none of that had taken place, so . . . these do appear to me to be preliminary questions. Uh,

6

he's not in custody. He's not cuffed. He hasn't been arrested, so I will deny the . . . motion to exclude his statements."

## II

### *Defendant's Receipt of a "*Watson *Admonition" in 2012*

In 2009, defendant was convicted in Orange County of DUI (Veh. Code, § 23152, subd. (a)), and "sentenced to a grant of probation." At trial in the instant case, an officer from the Orange County Sheriff's Department testified that, in 2012, he participated in Orange County Mothers Against Drunk Driving victim impact panels by providing security for the attendees and participants, speaking "upon the hazards and dangers of" drunk driving, and "provid[ing] . . . the *Watson* advisement." The officer explained that a "sign-up sheet that people [had to] sign into in order to get credit for having attended" the event "as part of their probation" reflected that—in connection with his 2009 conviction—defendant attended a victim impact panel on August 3, 2012.

The Orange County officer further testified that he read "the *Watson* admonition" to defendant "and the others in attendance" on August 3, 2012, telling them that "being under the influence of alcohol or drugs or both impairs the ability to safely operate a motor vehicle. Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or drugs or both. If you continue to drive while under the influence of alcohol or drugs or both and as a result of that driving someone is killed, you can be charged with murder."

## III

### *Defense Evidence*

Defendant presented evidence from an "accident reconstruction expert," who was also a former CHP officer, who testified that, in his opinion, the pickup truck was going 55 miles per hour just before the crash.

## IV

### *Closing Arguments*

The prosecutor argued to the jury that this was a "classic textbook second degree *Watson* DUI murder." "[D]efendant made the conscious choice to drive that truck with [Cesario] in it after having dr[u]nk all day and having gone to the class that [the officer from Orange County] explained to you" and "spen[ding] three hours being told the horrors of driving under the influence. You [are] told and then you [are] given the admonition, and then they hope that you don't do it again. You are told if you do that, you will kill someone, and . . . that's exactly what happened here."

Defendant's attendance at the 2012 class in Orange County was "circumstantial evidence that the defendant knew" "the dangers of driving under the influence" "when he decided to drive" before the crash. And defendant's statement to the CHP officer after the crash was "direct evidence. That's the confirmation that the defendant remembered the lesson taught by" the Orange County officer in 2012, the prosecutor maintained.

"This case was an accident, not a murder," defense counsel told the jurors. "[Y]ou did hear some evidence of [defendant's] out-of-court statements and [the prosecutor] highlighted those in his closing argument, but the things you need to remember is the context of these statements. [Defendant] had just been in a major accident where his friend was killed. He's upset. He's crying. He's despondent."

Yes, defendant "attend[ed] the victim impact panel in" 2012, and "[t]he *Watson* advisement was read at the end of the panel." But, defense counsel argued, that was "no[t] evidence that [defendant] comprehended or understood beyond a reasonable doubt level of certainty . . . about what happened at this panel. There's no evidence that [defendant] was thinking about the victim impact panel he attended when he chose to drive. . . . He was not thinking about what happened . . . four years prior, and the fallacy that the [prosecutor] is relying on is that once [defendant] is interviewed by [the CHP officer], he has already killed his friend, so it is very apparent to [defendant] that drinking

8

and driving is dangerous because his friend is dead. . . . It was the question when [defendant] chose to drive, did he have this knowledge, and it has not been proven to you."

V

*Verdicts*

Counts 4 and 5 were resolved prior to trial. On July 28, 2020, count 4 was dismissed on motion of the district attorney. On August 6, 2020, defendant pleaded no contest to count 5. The jury thereafter found defendant guilty of counts 1, 2, and 3. The jury also found "true" the great bodily injury special allegation (§ 12022.7) and elevated blood-alcohol level (Veh. Code, § 23578) in counts 2 and 3.

VI

*Motion for New Trial*

Following the jury's verdict, on August 27, 2020, defendant filed a petition for juror identification information. In a signed declaration submitted in support of the petition, counsel for defendant stated that following the jury's verdict, he spoke outside the courthouse with Juror No. 2. He further stated that, in reaching their verdict, Juror No. 2 told him that the jurors had relied on their common sense and experience that everyone knows drinking and driving is dangerous. Defense counsel stated that Juror No. 2 also stated to him that some jurors mentioned the process they had to go through to get their driver's licenses that included notice about the dangers of drinking and driving. Further, Juror No. 2 told him that "one of the jurors had attended similar classes to the [v]ictim [i]mpact [p]anel attended by [defendant]. . . . Juror #2 stated this juror shared with his fellow jurors information about the classes he attended, and the information that was discussed at these classes."

Further, defense counsel reminded the trial court that it had granted a defense in limine motion to exclude "prejudicial and inflammatory evidence [defendant] was

9

exposed to at the [v]ictim [i]mpact [p]anel about the details of drinking and driving fatalities and the impact on the families of the victim."

Defense counsel feared "the jury considered outside evidence . . . when reaching their guilty verdict." Thus, "[f]urther investigation [was] necessary." And "interviewing the jurors '[was] reasonably likely to produce admissible evidence of juror misconduct' "—a possible basis of a future new trial motion.

The People opposed the motion, arguing defendant failed at the threshold stage of demonstrating "the required prima faci[e] showing of good cause" required by Code of Civil Procedure section 237, subdivision (b).[2]

The trial court denied the motion, explaining: "I . . . d[o]n't find these general comments by juror number two . . . rise to th[e] level" of the requirement articulated in *People v. Johnson* (2013) 222 Cal.App.4th 486 (*Johnson*)—that "there is information that is . . . 'reasonably likely to produce admissible evidence of juror misconduct.' "

VII

*Sentencing*

At a September 2020 hearing, the trial court imposed a sentence of 15 years to life on count 1, and six-year terms on counts 2 and 3, staying both subordinate terms pursuant to section 654.[3]

---

[2] "Any person may petition the court for access to [the names, addresses, and telephone numbers of jurors]. The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information. The court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release of the personal juror identifying information, . . . . If the court does not set the matter for hearing, the court shall . . . make express findings . . . of a lack of a prima facie showing of good cause . . . ."

[3] Which, *at the time of sentencing*, provided in pertinent part: " (a) An act . . . that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the *longest* potential term of imprisonment." (Italics added.)

At the beginning of the hearing, when articulating "its tentative decision" to deny probation and impose the 15-year-to-life sentence for count 1, the trial court said: "[I]n this case we have a defendant who had previously been convicted of a DUI, and the state did everything it possibly could to prevent another DUI from happening. License was suspended. He was fined. He was sent to victim impact panels, and that was obviously unsuccessful." "So, despite all these efforts the state made to prevent this incident from happening, those efforts were unsuccessful."

After hearing defense counsel's argument, the trial court explained: "This is a harsh sentence. . . . [Defendant]'s quite different from most people that receive a life sentence. I have a great deal of optimism and hope for him. He will obviously be eligible for parole and has a great deal of his sentence completed already . . . . But it's a strict sentencing scheme that's designed . . . that's evolved . . . and it's the result of the will of the people of the [S]tate of California for this particular type of crime. People in California are fed up with all the lives that have been lost as a result of drinking and driving, especially when there's been an opportunity made available to stop that conduct."

Defendant timely appealed.**4**

## DISCUSSION

### I

### *The Miranda Claim*

A. *Background Legal Principles*

"Before they begin custodial interrogation of a suspect, the police have an obligation to deliver *Miranda* warnings. This familiar admonition warns the suspect of the right to remain silent, that any statement may be used as evidence against him or her,

---

**4**     This case was fully briefed and assigned to this panel January 31, 2022.

and that the suspect has a right to the presence of a retained or appointed attorney. [Citation.] The warning is meant to protect the suspect's privilege against self-incrimination, which is jeopardized by the inherently coercive nature of police custodial questioning. [Citation.]

"The purpose of *Miranda* guides the meaning of the word 'custody,' which refers to circumstances 'that are thought generally to present a serious danger of coercion.' [Citation.] Such a danger of coercion is usually present where there has been a ' " 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." ' [Citations.] The key question is whether, under all of the objective circumstances, a reasonable person in the suspect's position would have felt free to terminate the interrogation. [Citations.] But even if a person's freedom of movement has been curtailed, an 'additional question' arises: 'whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.' [Citations.]" (*People v. Caro* (2019) 7 Cal.5th 463, 491 (*Caro*).)

Determining whether custody occurred is a fact-specific inquiry based on the totality of the circumstances. (*Caro, supra*, 7 Cal.5th at p. 492; *People v. Forster* (1994) 29 Cal.App.4th 1746, 1754 (*Forster*).)

Among the relevant factors are: "(1) whether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning." (*Forster, supra*, 29 Cal.App.4th at p. 1753.) Other factors "are [(6)] whether the suspect agreed to the interview and was informed he or she could terminate the questioning, [(7)] whether police informed the person he or she was considered a witness or suspect, [(8)] whether there were restrictions on the suspect's freedom of movement during the interview, and [(9)] whether police officers dominated and controlled the interrogation or were 'aggressive, confrontational, and/or accusatory,' whether they pressured the suspect, and [(10)] whether the suspect was arrested at the

conclusion of the interview." (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403-1404.)

"This initial custody determination does not depend on 'the subjective views harbored by either the interrogating officers or the person being questioned.' " (*Caro, supra*, 7 Cal.5th at p. 492.) Nor is one factor necessarily dispositive, "it is the totality of circumstances that is relevant . . . . " (*Forster, supra*, 29 Cal.App.4th at p. 1754.)

In *Howes v. Fields* (2012) 565 U.S. 499, the United States Supreme Court emphasized that " 'the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody,' " and that "[t]his important point [was] illustrated . . . in" *Berkemer v. McCarty* (1984) 468 U.S. 420, wherein the court "held that the roadside questioning of a motorist who was pulled over in a routine traffic stop did not constitute custodial interrogation." (*Howes*, at pp. 509-510, citing *Berkemer*, at pp. 423, 441-442.) "[A] person detained as a result of a traffic stop is not in *Miranda* custody because such detention does not 'sufficiently impair [the detained person's] free exercise of his privilege against self incrimination to require that he be warned of his constitutional rights.' [Citation.] As [the Supreme Court] later put it, the 'temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody,' [citations]." (*Howes*, at p. 510.)

In reviewing a trial court's ruling on a motion to suppress based on a *Miranda* violation, the appellate court independently determines from the undisputed facts and facts properly found by the trial court whether the challenged statement was obtained in violation of *Miranda*. (*People v. Thomas* (2011) 51 Cal.4th 449, 476.)

The parties here agreed on the relevant facts in the trial court and agree on appeal as to what occurred, but dispute whether what occurred was a custodial interrogation such that defendant was required to be informed of his rights under *Miranda*. (See *Meddock v.*

13

*County of Yolo* (2013) 220 Cal.App.4th 170, 175, fn. 3 [if the parties agree as to the facts, we may accept their agreed facts as mutual concessions].)

    B. *Analysis*

    Based on the totality of circumstances, we do not find that defendant was in custody, or the equivalent thereof, when he was questioned by the CHP officer in this case.

    Defendant's questioning occurred at a public roadside, and while defendant observes that the roadside where he was questioned "was a rural area at night," this does not imply coerciveness and is not analogous to questioning inside a police station or vehicle. Police questioning in a public place presents much less of a danger of coercion than questioning that occurs in a police vehicle or a police station. (Cf. *U.S. v. Jones* (1st Cir. 1999) 187 F.3d 210, 218 ["Although the location apparently was not familiar to [the defendant] and the area was not well-lit, a public highway is a neutral setting that police officers are not in a position to dominate as they are, for example, an interrogation room at a jailhouse"]; *People v. Torres* (2018) 25 Cal.App.5th 162, 176, 180 [*Miranda* violation where, inter alia, "[t]he police interview took place in an unmarked car, a location controlled by the detectives, with the doors closed and the engine running to power the air-conditioner"]; *People v. Saldana* (2018) 19 Cal.App.5th 432, 456, 461 [*Miranda* violation where, inter alia, "[t]he interrogation occurred behind a closed door in the interrogation room of the . . . police station," and quoting *Miranda, supra*, 384 U.S. at p. 450, for the proposition that "at the police station, ' "the investigator possesses all the advantages" ' "].)

    Although defendant argues that he was detained for more than 23 minutes, he concedes that such time period was not exceptionally long. We agree. In *People v. Kopatz* (2015) 61 Cal.4th 62, our Supreme Court rejected a *Miranda* claim where, inter

alia, "the interview . . . was investigatory" and "lasted less than an hour" (*id.* at pp. 81-82).

Defendant contends that he was outnumbered at least four-to-one by officers and was alone. However, it appears defendant was only questioned by one officer and even if we were to assume other officers were in close proximity to defendant when he was questioned by the CHP officer, we find that ratio is insufficient in and of itself to support a finding of custodial interrogation. (Cf. *People v. Breault* (1990) 223 Cal.App.3d 125, 135 [finding no *Miranda* violation when two officers *questioned* the defendant].)

Even assuming for the sake of argument that defendant is correct in asserting that his identification "was retained" by police and not "returned" to him, certainly law enforcement is allowed to collect a driver's identification at the scene of a traffic collision without a defendant being thereby "in custody." Such a circumstance is consistent with a permissible investigatory detention. (Cf. *People v. Pilster, supra*, 138 Cal.App.4th at p 1405 ["Whether an individual has been . . . seized for Fourth Amendment purposes and whether that individual is in custody for *Miranda* purposes are two different issues"]; *U.S. v. Revels* (10th Cir. 2007) 510 F.3d 1269, 1274 ["whether an individual is subject to a lawful investigative detention within the meaning of the Fourth Amendment does not necessarily answer the separate question of whether a suspect is in custody for purposes of *Miranda*"].)

Defendant contends this case is similar to *People v. Bejasa* (2012) 205 Cal.App.4th 26 (*Bejasa*). Defendant argues: "In this police-dominated atmosphere and given that [defendant] had essentially confessed to driving under the influence of alcohol and causing death while driving without a license, the only reasonable expectation under the circumstances would be an imminent arrest." The facts of this case are not as favorable to this defendant as they were to the defendant in *Bejasa*.

In *Bejasa*, the defendant was driving a vehicle that collided head on with another vehicle, severely injuring the defendant's passenger. The first police officer to arrive at

15

the scene contacted Bejasa after making sure that the injured parties were being treated by paramedics, and asked him what happened. During this brief interaction, the officer noticed that Bejasa's eyes were bloodshot, and he told Bejasa to sit on the curb. After other officers arrived, the first officer then resumed questioning Bejasa. Bejasa consented to a search, during which the officer located two syringes, one that was empty and one that contained a liquid, later determined to be methamphetamine. (*Bejasa, supra*, 205 Cal.App.4th at pp. 32-33.) Bejasa admitted he used the syringe to " 'shoot up methamphetamine.' " (*Id.* at p. 33.) The officer then handcuffed Bejasa and placed him in the back of his police car to await officers from the traffic department. As Bejasa was being handcuffed, the officer informed him that " 'he was being detained for a possible parole violation.' " (*Ibid*.) The officer did not give Bejasa *Miranda* warnings. When the traffic officer arrived at the scene, he allowed Bejasa to get out of the police car, removed his handcuffs, and proceeded to interview him, using a form provided by the Hemet Police Department, in order to determine whether Bejasa had been driving under the influence. In response to the officer's questions, Bejasa made incriminating statements regarding his use of drugs. The officer subsequently administered field sobriety tests and at the conclusion of the tests, the officers advised Bejasa he was under arrest. Bejasa's blood subsequently tested positive for methamphetamine. (*Bejasa, supra*, 205 Cal.App.4th at pp. 33-34.)

The appellate court's determination that Bejasa was subjected to custodial interrogation was based upon the fact that Bejasa had made several incriminating statements before he was handcuffed, restrained in the officer's patrol car, and told that he was being detained for a possible parole violation. "Defendant was confronted with *two of the most unmistakable indicia of arrest*: he was handcuffed and placed in the back of a police car." (*Bejasa, supra*, 205 Cal.App.4th at p. 37, italics added.) Those factors do not exist in this case.

16

As we have previously explained, defendant's argument that this was a "police-dominated atmosphere," i.e., one of coercion or intimidation, is unavailing. The significant distinction between this case and the facts in *Bejasa*, is that as here, unlike in *Bejasa*, there was no extreme indicia of custody such as handcuffing and detention in a police car. (See *Bejasa, supra*, 205 Cal.App.4th at p. 37.)

Although the first officer to contact defendant asked him whether he had been driving when the vehicle crashed, and the CHP officer asked questions about whether the defendant had been drinking, those are permissible questions during the course of a DUI investigation that do not require *Miranda* advisements. "General on-the-scene questioning may take place of persons temporarily detained by officers who do not have probable cause to arrest. Questioning under these circumstances is designed to bring out the person's explanation or lack of explanation of the circumstances which aroused the suspicion of the police, and thus enable the police to quickly ascertain whether such person should be permitted to go about his business or held to answer charges. (*Lockridge v. Superior Court* (1969) 275 Cal.App.2d 612, 620; *People v. Manis* (1969) 268 Cal.App.2d 653, 669.)" (*People v. Milham* (1984) 159 Cal.App.3d 487, 500.) " 'When circumstances demand immediate investigation by the police, the most useful, most available tool for such investigation is general on-the-scene questioning, designed to bring out the person's explanation . . . and enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges.' " (*People v. Davidson* (2013) 221 Cal.App.4th 966, 968 (*Davidson*).) " 'Do we then allow the police to ask questions of persons suspected of crime who have been temporarily detained for investigation? In California the answer is yes, an answer initially formulated as the privilege of the police to seek out and question suspects and those believed to have knowledge of crime, but which has been subsequently broadened to include brief questioning of persons who have been involuntarily detained.' " (*Id.* at p. 971.)

17

"There are, of course, limits to the rule allowing 'brief and casual' investigatory questions. If the questioning is aggressive, confrontational, accusatory, coercive, or sustained, the court may find a violation of *Miranda*." (*Davidson, supra*, 221 Cal.App.4th at p. 973.) Here defendant focuses on the two questions asked by the CHP officer prior to his arrest: whether defendant "knew that drinking and driving can result in serious bodily injury or death to another person?" and the follow up question, "You did and you decided to do it anyway?" While these two questions can be viewed as accusatory, we must analyze the totality of the circumstances at the time the statements were made, in determining whether defendant was "in custody" for purposes of *Miranda* warnings. When engaging in that analysis, it makes no difference whether the crime being investigated is a traffic violation, DUI, or murder. "We hold therefore that a person subjected to custodial interrogation is entitled to the benefit of the procedural safeguards enunciated in *Miranda*, regardless of the nature or severity of the offense of which he is suspected or for which he was arrested." (*Berkemer v. McCarty, supra*, 468 U.S. at p. 434.)

Based upon our review of all relevant factors, we do not conclude that defendant was in custody when he responded to the above questions. Rather, we find that here, when police conducted an investigatory detention at the scene of an apparent DUI, they engaged in a permissible law enforcement activity that did not violate defendant's *Miranda* rights.

Accordingly, we find defendant was not subject to *custodial* interrogation;[5] therefore, no *Miranda* violation occurred, and the trial court correctly admitted defendant's statements.

---

[5] Accordingly, we need not address defendant's contention that he was "[i]nterrogat[ed] for *Miranda* purposes."

18

## II

### *Ineffective Assistance of Counsel (IAC) Claim*

Defendant argues that even if the trial court's ruling "were correct . . . then trial counsel rendered constitutionally deficient representation in failing to point out to the court that the preliminary hearing testimony required granting the *Miranda* motion." Specifically, defendant maintains that—since the trial court denied the *Miranda* motion "on the basis that" defendant did "not . . . know[ ] he was in big trouble" (because he "was not obviously 'wasted' ")—"[h]ad trial counsel pointed out" preliminary hearing testimony, the *Miranda* motion might have been successful. This is because preliminary hearing testimony "showed how obvious it was to everyone how intoxicated [defendant] was and . . . that [defendant] made incriminating statements about drinking and driving well before the interrogation about his state of mind."

The People argue trial counsel had a "valid reason for not" doing what defendant says he should have done: preliminary hearing testimony was not admissible at the *Miranda* hearing unless the prosecution stipulated to its admission. "As repeatedly explained in the context of suppression hearings, the testimony given at a preliminary examination is not in evidence at a special, de novo pretrial hearing unless the parties stipulate to its admission or the testimony is admissible under some exception to the hearsay rule. (See *People v. Johnson* (1984) 162 Cal.App.3d 1003, 1010, fn. 4; *Wilder v. Superior Court* (1979) 92 Cal.App.3d 90, 94; *People v. Cagle* (1971) 21 Cal.App.3d 57, 60.)" (*People v. Lopez* (1997) 52 Cal.App.4th 233, 241, fn. 3.) As the parties "did not" so stipulate, trial counsel "could not" introduce that evidence.

To prevail on an IAC claim, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 691-692.) A reviewing court may reject an IAC claim addressing

19

both components if a defendant makes an insufficient showing as to either prong. (*Id.* at p. 697.)

Here, we need not analyze trial counsel's performance, because defendant has not demonstrated prejudice.

This is so because the IAC claim rests on the false premise that it mattered whether defendant "kn[ew] he was in big trouble."[6] "Th[e] initial custody determination does not depend on 'the *subjective views* harbored by . . . the person being questioned.' " (*Caro, supra*, 7 Cal.5th at p. 492, italics added; see *J. D. B. v. North Carolina* (2011) 564 U.S. 261, 271 ["[t]he test . . . involves no consideration of the 'actual mindset' of the particular suspect subjected to police questioning"].)

The reason for this is that "[p]olice must make in-the-moment judgments as to when to administer *Miranda* warnings. By limiting analysis to the objective circumstances of the interrogation . . . the objective test avoids burdening police with the task of anticipating the idiosyncrasies of every individual suspect and divining how those particular traits affect each person's subjective state of mind." (*J. D. B. v. North Carolina, supra*, 564 U.S. at p. 271.)

Thus, even if trial counsel *had* somehow managed to get the trial court to consider testimony from defendant's preliminary hearing that indicated defendant's subjective awareness of the trouble he was in (because he knew how inebriated he was) when he was being questioned by the CHP officer, such evidence is irrelevant to proper analysis of a *Miranda* claim.

---

**6** While the trial court framed the issue this way, that is not how we understand the relevant legal issue. And we review the trial court's ruling, not its reasoning. (*People v. Mason* (1991) 52 Cal.3d 909, 944.)

III

*Jury Instructions*

Defendant argues the trial court erred by failing to provide sua sponte instructions to the jury (a) on "gross vehicular manslaughter while intoxicated as a lesser included offense of murder" under the "expanded accusatory pleading test" announced in *People v. Ortega* (2015) 240 Cal.App.4th 956 (*Ortega*), and (b) that the great bodily injury enhancement (§ 12022.7, subd. (a)) was inapplicable to counts 2 and 3 if Cesario was "an accomplice." Defendant also asks us to "urge the Supreme Court to revisit its holding" in *People v. Sanchez* (2001) 24 Cal.4th 983 (*Sanchez*) "that gross vehicular manslaughter while intoxicated is not a lesser included offense of murder as a matter of law."

We agree with the People that there was no instructional error.

A trial court "has a sua sponte duty to instruct on all elements of an offense and on the general principles of law governing a case." (*People v. Singh* (2019) 42 Cal.App.5th 175, 183.) This duty includes " 'instruct[ing] on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser.' " (*People v. Alvarez* (2019) 32 Cal.App.5th 781, 786 (*Alvarez*).)

"There are two tests for determining whether an uncharged crime is a lesser included offense. 'Under the elements test, a court determines whether, as a matter of law, the statutory definition of the greater offense necessarily includes the lesser offense.' [Citation.] This test is satisfied if ' "all legal elements of the lesser offense are also elements of the greater." ' [Citation.] 'Under the accusatory pleading test, a court reviews the accusatory pleading to determine whether the facts actually alleged include all of the elements of the uncharged lesser offense; if it does, then the latter is necessarily included in the former.' [Citations.]" (*Alvarez, supra*, 32 Cal.App.5th at p. 786.)

A. Ortega *and the "expanded" accusatory pleading test*

Recognizing that "[o]ther . . . courts of appeal have declined to follow *Ortega*," defendant asks us follow *Ortega* and conclude that the trial court erred by not giving an

21

instruction on gross vehicular manslaughter while intoxicated as a "lesser offense" of the charged murder, because "the preliminary hearing made clear that [defendant] could not have committed the charged murder without committing the lesser offense of gross vehicular manslaughter while intoxicated." The People urge us to "reject[ ]" defendant's invitation "to embrace *Ortega*," which "has not been followed by any published case and proposes an untenable rule for lesser offenses."

We find persuasive the cases disagreeing with *Ortega*'s "expanded" accusatory pleading test. Accordingly, we decline to follow *Ortega*, and we reject defendant's argument that relies on it.

"The defendant in *Ortega* was charged with forcible sexual penetration (§ 289, subd. (a)(1)(A)) based on evidence of digital penetration. (*Ortega*, [*supra*, 240 Cal.App.4th] at pp. 960-961.) On appeal he argued the [trial] court should have instructed jurors that sexual battery was a lesser included offense of forcible sexual penetration. The [appellate] court agreed. Although it was not a lesser included offense under the elements test, it was such under 'an expanded accusatory pleading test.' (*Id.* at p. 967.) The [appellate] court reasoned that 'evidence adduced at the preliminary hearing must be considered in applying the accusatory pleading test when the specific conduct supporting a holding order establishes that the charged offense necessarily encompasses a lesser offense.' (*Ibid.*) It believed this rule naturally followed a criminal defendant's due process right to be prosecuted only on the noticed charges. (*Id.* at pp. 968-969.)" (*Alvarez, supra*, 32 Cal.App.5th at p. 787.)

"[T]he Supreme Court has reiterated that '[t]he trial court need only examine the accusatory pleading' in applying the accusatory pleading test. (*People v. Smith* (2013) 57 Cal.4th 232, 244 [further noting the test 'does not require or depend on an examination of the evidence adduced at trial']; see *People v. Banks* (2014) 59 Cal.4th 1113, 1160.)

"[Three] recent reported decisions have relied on [*People v.*] *Montoya* [(2004) 33 Cal.4th 1031] to reject *Ortega*'s 'expanded' accusatory pleading test. In [*People v.*] *Macias* [(2018)] 26 Cal.App.5th 957, a defendant was charged with and convicted of using a minor for purposes of posing for sexual conduct (§ 311.4, subd. (c)) based on evidence he had surreptitiously filmed his partner's daughter. He claimed the trial court should have instructed jurors that unauthorized invasion of privacy was a lesser included offense under *Ortega*'s 'expanded' accusatory pleading test. (*Macias*, at p. 961.) The court rejected *Ortega*'s test as 'contrary to *Montoya*'—a case *Ortega* did not cite—and 'not . . . followed by any published cases.' (*Id.* at p. 964.)

"Squarely on point is the case that followed *Macias*: [*People v.*] *Munoz* [(2019)] 31 Cal.App.5th 143. After a jury convicted a defendant of *Watson* murder, he raised the same challenge raised here as to the [trial] court's refusal to instruct jurors on gross vehicular manslaughter while intoxicated as a lesser offense. Rejecting that claim, the *Munoz* court highlighted the rule under *Montoya*: 'when applying the accusatory pleading test to determine whether one offense is necessarily included in another, courts do not look to evidence beyond the actual pleading and its allegations regarding the purported greater offense.' (*Id.* at p. 156.) Because *Ortega* failed to reconcile this rule and had been rejected by the only published case citing it ([*People v.*] *Macias, supra*, 26 Cal.App.5th 957), the *Munoz* court declined to follow *Ortega*. (*Munoz*, at pp. 157-158.)" (*Alvarez, supra*, 32 Cal.App.5th at p. 788, fn. omitted.)

"*Montoya* disapproved of *People v. Rush* (1993) 16 Cal.App.4th 20, which considered evidence from the preliminary hearing in applying the accusatory pleading test. (*Id.* at p. 27; [*People v.*] *Montoya, supra*, 33 Cal.4th at p. 1036, fn. 4; see [*People v.*] *Macias, supra*, 26 Cal.App.5th at p. 964 [discussing *Montoya*'s disapproval of *Rush*].) *Ortega* did not cite *Montoya* or attempt to reconcile its analysis. As an intermediate appellate court, we are required to follow Supreme Court precedent. (*Auto Equity Sales,*

*Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)" (*Alvarez, supra*, 32 Cal.App.5th at p. 788.)

In *Alvarez*, the third case rejecting *Ortega*'s "expanded" accusatory pleading test, the appellate court rejected the defendant's "attempt[ ] to distinguish *Montoya* as a multiple conviction case, i.e., where a defendant is charged with and convicted of both the greater and lesser offenses. [The defendant] argue[d] that an 'expanded' accusatory pleading test [was] more appropriate 'in an uncharged lesser conviction case . . . .' " (*Alvarez, supra*, 32 Cal.App.5th at p. 788.) *Alvarez* disagreed, explaining "[w]e do not read *Montoya* so narrowly. The court articulated the general standard for the accusatory pleading test before considering its application in a multiple conviction case. ([*People v.*] *Montoya, supra*, 33 Cal.4th at pp. 1035-1036.)" (*Alvarez, supra*, 32 Cal.App.5th at p. 788.)

Here too, defendant seeks to distinguish *Montoya* as a multiple conviction case. Like the court in *Alvarez*, we are not persuaded.

The trial court did not err.

B. *Section 12022.7 enhancement*

"Any person who personally inflicts great bodily injury on any person *other than an accomplice* in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years." (§ 12022.7, subd. (a), italics added.)

In connection with the great bodily injury enhancement found true by the jury vis-à-vis counts 2 and 3, defendant argues the trial court erred by failing to give a sua sponte instruction to the jury that the People had to prove that Cesario was not an accomplice Specifically, defendant maintains that "the jury could have found that Cesario knew that [defendant] intended to drive drunk" and "facilitated [defendant's] drunk driving by accompanying [defendant] despite his degree of intoxication."

24

We agree with the People that the trial court did not err, as defendant has not demonstrated that there was substantial evidence at trial that Cesario was an accomplice to defendant's DUI.

An accomplice's "liability . . . depends on whether he promotes, encourages, or assists the perpetrator and *shares* the perpetrator's criminal purpose. [Citation.] It is not sufficient that he merely gives assistance with knowledge of the perpetrator's criminal purpose. [Citations.]" (*People v. Sully* (1991) 53 Cal.3d 1195, 1227.)

Accordingly, that Cesario *knew* that defendant "intended to drive drunk" does *not* support the inference that Cesario *shared* defendant's criminal purpose. The evidence reflects just the opposite. Minutes before the crash, when defendant and Cesario left a restaurant, they argued in the parking lot, as Cesario "begg[ed] [defendant] to let him drive."

C. Sanchez *and gross vehicular manslaughter while intoxicated*

Our Supreme Court has held that gross vehicular manslaughter while intoxicated, in violation of section 191.5, is not a lesser included offense of murder. (*Sanchez, supra,* 24 Cal.4th at pp. 985, 991.)

"[T]o preserve" this issue "for the purpose of asking the Supreme Court to reconsider *Sanchez,*" defendant argues his prosecution for murder was "unjust," and "exemplifies [a] problem" with the *Sanchez* majority's analysis that was highlighted by the dissenting opinion in the case: "[h]ad the jury been instructed on manslaughter, it is quite likely it would have found that [defendant] lacked the mens rea for murder." Whatever the merits of this contention, we are bound by the *Sanchez* majority opinion (*Auto Equity Sales, Inc. v. Superior Court, supra*, 57 Cal.2d at p. 455), and we decline defendant's invitation to urge our Supreme Court to reconsider *Sanchez.*

IV

*Denial of Motion for Jurors' Contact Information*

Defendant argues the trial court contravened California law and the federal Constitution by denying his motion for juror contact information. The People do not address defendant's federal claim, but argue the trial court did not err under state law. We find no error.

A. *The state claim*

"Under Code of Civil Procedure section 237, in a criminal case, the trial jurors' 'personal juror identifying information'—defined as their names, addresses, and telephone numbers—must be sealed after their verdict is recorded. (Code Civ. Proc., § 237, subd. (a)(2).) However, '[a]ny person may petition the court for access to these records. The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information.' (Code Civ. Proc., § 237, subd. (b); see Code Civ. Proc., § 206, subd. (g).)

"If the trial court finds that the moving party has made a prima facie showing of good cause, and if it finds no compelling interest against disclosure, it must set the matter for hearing. (Code Civ. Proc., § 237, subd. (b).) The trial jurors are entitled to notice, an opportunity to object to disclosure, and an opportunity to appear. (Code Civ. Proc., § 237, subd. (c).)

"If none of the jurors object, the trial court must grant disclosure." (*Johnson, supra*, 222 Cal.App.4th at p. 492.)

To meet the required prima facie "good cause" showing, a defendant "simply has to prove that talking to the jurors is reasonably likely to produce admissible evidence of juror misconduct." (*Johnson, supra*, 222 Cal.App.4th at p. 493; see *People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1322 [defendant must "explain how the juror's conduct was 'of such a character as is likely to have influenced the verdict improperly' (Evid. Code, § 1150, subd. (a))"].)

26

" 'Good cause does not exist where the allegations of jury misconduct are speculative, conclusory, vague, or unsupported.' [Citation.] ' "Absent a satisfactory, preliminary showing of possible juror misconduct, the strong public interests in the integrity of our jury system and a juror's right to privacy outweigh the countervailing public interest served by disclosure of the juror information . . . ." ' [Citation.]" (*People v. Munoz, supra*, 31 Cal.App.5th at p. 165.)

"A juror's impermissible reliance on extrajudicial information (that is, new facts) is different from a juror's more permissible reliance on her or his life experiences when evaluating the evidence presented at trial." (*In re Manriquez* (2018) 5 Cal.5th 785, 812.)

" '[T]he criminal justice system must not be rendered impotent in quest of an ever-elusive perfection. The jury system is fundamentally human, which is both a strength and a weakness. [Citation.] Jurors are not automatons. They are imbued with human frailties as well as virtues. If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias. To demand theoretical perfection from every juror during the course of a trial is unrealistic.' " (*People v. Danks* (2004) 32 Cal.4th 269, 304.)

We review the trial court's ruling for an abuse of discretion. (*People v. Munoz, supra*, 31 Cal.App.5th at p. 165.)

Here, in a signed declaration in support of the motion for juror contact information, defense counsel represented that Juror No. 2 informed him that "one of the jurors" (Juror X) told other jurors that he had attended classes that were "similar . . . to the [v]ictim [i]mpact [p]anel attended by" defendant, and that Juror X "shared . . . information about th[ose] classes . . . and . . . information that was discussed at th[o]se classes." Defense counsel feared that, in this way, "the jury considered outside evidence . . . when reaching their guilty verdict," making "[f]urther investigation . . . necessary."

At oral argument on the motion, defense counsel argued "it [was] worth looking into" the question whether "jurors were lowering the prosecution's burden of proof by

27

relying on evidence . . . that was not presented at th[e] trial," including Juror X's "attendance at some sort of drinking and driving type class that might have gone outside the scope of what" the Orange County officer testified to.

The trial court denied the motion, explaining that the "general comments by" Juror No. 2 did not amount to a prima facie "good cause" showing of juror misconduct. We agree.

That Juror X "shared" (a) "information about" DUI classes that he attended that were similar to the ones defendant attended in Orange County, and (b) "information that was discussed" at those classes, without more, does not suggest that Juror X actually relied on (or encouraged other jurors to rely on) new facts. (Cf. *In re Manriquez, supra*, 5 Cal.5th at p. 812 ["impermissible reliance on" "new facts" "is different from . . . permissible reliance on . . . life experiences"].) Rather, Juror No. 2's statement merely suggests that—"when evaluating the evidence presented at trial" of defendant's attendance at a DUI class in Orange County—Juror X invoked "her or his life experience[ ]" of attending a similar class. (*Ibid.*; cf. *In re Lucas* (2004) 33 Cal.4th 682, 694, 697 [rejecting a claim of juror misconduct, and explaining that a juror's comments during deliberations "merely reflected his own experience as it related to the evidence received at the trial and the inferences that [a party] sought to have the jurors draw from that evidence"].)

That is normal human interaction, even if not ideal in the context of a jury trial. And as our Supreme Court explained, because " '[t]he jury system is fundamentally human,' " " '[i]f the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias. To demand theoretical perfection from every juror during the course of a trial is unrealistic.' " (*People v. Danks, supra*, 32 Cal.4th at p. 304.)

Accordingly, the trial court did not abuse its discretion in ruling that defense counsel failed to make the necessary preliminary showing of possible juror misconduct.

28

(Cf. *People v. Jefflo, supra*, 63 Cal.App.4th at p. 1322 ["counsel's declaration and later representations to the court did not constitute a good cause showing of juror misconduct justifying a subsequent hearing under Code of Civil Procedure section 237"].)

B. *The federal claim*

In support of his federal constitutional claim, defendant cites *People v. Tuggles* (2009) 179 Cal.App.4th 339, a decision by a panel of this court. *Tuggles* does not advance defendant's claim; it hinders it. In that case, while considering the defendants' contention that "even if Code of Civil Procedure sections 206 and 237 support[ed] the trial court's denial of access to jurors' contact information, [the defendants'] federal constitutional rights compelled the release of the information to counsel," the *Tuggles* court explained that it found no "case from the United States Supreme Court or the appellate courts of the State of California holding that any provision of the federal Constitution requires the disclosure of the personal contact information of a juror to parties, their counsel, their representatives, or members of the general public." (*Tuggles*, at pp. 383, 385.) Defendant provides no authority suggesting *Tuggles* was wrong on that point.

Accordingly, we reject defendant's federal constitutional claim.

V

*Assembly Bill No. 518 and Section 654*

In supplemental briefing, defendant argues that if we affirm defendant's murder conviction, we must remand the matter to permit the trial court "to exercise its newfound discretion under section 654 as amended by" Assembly Bill No. 518 (2021-2022 Reg. Sess.). The People argue "[r]emand is not appropriate because the record shows that the [trial] court would not have exercised its discretion to stay [defendant's] sentence for the . . . murder."

We agree with defendant.

29

Effective January 1, 2022, "Assembly Bill [No.] 518 amended . . . section 654, subdivision (a) to provide, in pertinent part: 'An act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision.' (Italics added.) Previously, where . . . section 654 applied, the sentencing court was required to impose the sentence that 'provides for the longest potential term of imprisonment' and stay execution of the other term. [Citation.] As amended by Assembly Bill [No.] 518, . . . section 654 now provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.)

The People concede that under *In re Estrada* (1965) 63 Cal.2d 740, Assembly Bill No. 518 applies to defendant's case that is not yet final. We agree. (*People v. Mani, supra*, 74 Cal.App.5th at p. 379.)

But the People insist that, because "there was a clear indication that the trial court was not amenable to decreasing [defendant's] state prison sentence," we need not remand. We decline to draw a similar inference.

Defendants " 'are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.] In such circumstances, [our Supreme Court has] held that the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

Though some of the trial court's comments at sentencing might support the notion that the trial court would not have stayed defendant's sentence for murder had it been aware of its discretion under Assembly Bill No. 518, we cannot say that the record clearly shows that.

The trial court explained that it was imposing "a harsh sentence," under "a strict sentencing scheme that's designed . . . that's evolved . . . for this particular type of crime." Because Assembly Bill No. 518 changed the "strict sentencing scheme" under which the trial court imposed defendant's "harsh" sentence for murder, remand is appropriate in this case to allow the trial court to exercise its new discretion whether to stay that sentence (count 1) under section 654.

Accordingly, the matter is remanded to allow the trial court to exercise its new discretion as to whether to stay count 1 under section 654.

## DISPOSITION

The matter is remanded to the trial court for it to consider whether to exercise its discretion under Assembly Bill No. 518. If applicable, the trial court shall forward a certified copy of a new abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

/s/

EARL, J.

We concur:

/s/

HULL, Acting P. J.

/s/

DUARTE, J.

31