Filed 5/29/24  P. v. Melillo CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>WILLIAM MICHAEL MELILLO,<br><br>    Defendant and Appellant. | D082358<br><br><br>(Super. Ct. No. SCE402675) |

APPEAL from a judgment of the Superior Court of San Diego County, Albert T. Harutunian III, Judge.  Affirmed.

Michael A. Taibi and Everett L. Skillman for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson, Elana W. Miller and Maxine Hart, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted William Michael Melillo of one count of lewd act upon a child (Pen. Code,[1] § 288, subd. (a)). The trial court sentenced him to the lower term of three years. Melillo appeals this judgment of conviction and claims four assignments of error. We reorder his claims slightly as follows: (1) his ex-wife's testimony was inherently improbable; (2) the court erred in admitting statements Melillo made to police; (3) the court improperly excluded evidence Melillo considered exculpatory; and (4) there is not substantial evidence to prove Melillo's intent to sexually exploit a child. We reject these claimed errors and affirm the judgment.

## FACTUAL BACKGROUND

Melillo awoke on June 27, 2020 at around seven in the morning and checked the baby monitor for his two-year-old child (Child). Melillo usually let his wife sleep in. After waking, he went into the restroom to read cartoon pornography and manually stimulate himself. He did not climax in the bathroom because he takes a long time to reach completion. Melillo testified that the act of manual stimulation, not the climax, is the satisfying part of the act for him. He then got Child out of her bed and took her downstairs for breakfast and to watch television. With his arm around Child on the couch, Melillo put his hand in his pants with his erect penis. Melillo expressed a desire to "cum," before directing Child to open her mouth. Melillo explained that he often had a hand in his pants because he's "usually itchy," and also that he easily gets aroused and erect. Melillo explained that he directed Child to open her mouth because he thought she might have something in her mouth although he had not seen her put anything in her mouth while they were on the couch.

---

[1]    Future undesignated statutory references are to the Penal Code.

2

He told police he had previously become erect while cuddling with and wrestling with Child; he attributed his arousal around Child to a lack of intimacy with his wife. Melillo further explained that Child viewed his penis as a toy and tried to grab and touch it multiple times. He described his penis as "a monster and just randomly does things that [he doesn't] want it to do." Nevertheless, Melillo asserts that he never touched Child inappropriately.

Melillo's wife, V.M., awoke and heard Melillo moaning and Child yelling. She got out of bed, opened the bedroom door, walked to an interior balcony and saw Melillo masturbating with his right hand and holding Child's arm with his left. V.M. heard Child yelling and saw her trying to escape Melillo's grasp. She heard Melillo direct Child to open her mouth and heard him say, "[l]et me cum in your mouth." She also heard him say, "[c]ome on, [Child]. I need this." V.M. was uncertain whether she was wearing her glasses when she observed the incident from a distance between 15 and 20 feet away from Melillo and Child, however, she had no difficulty describing actions 17.5 feet away from the witness stand at trial, even without her glasses. She confronted Melillo, then fainted. Melillo called for emergency services. Paramedics responded and attended to her injuries; when V.M. described what she witnessed, paramedics summoned the police.

Within twenty minutes of the incident, police officers arrived and began talking with Melillo and his wife. They spoke with V.M. while she received treatment in the ambulance and with Melillo as he sat on his lawn. Following their conversation with Melillo, the police arrested him, took him to the station, and advised him of his *Miranda*[2] rights, twice. Initially Melillo requested an attorney, then elected to continue speaking with police before again invoking his right to counsel and ending the interview.

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

DISCUSSION

1. *His Wife's Testimony Was Not Inherently Improbable*

Although Melillo's argument focuses largely on issues of credibility, the crux of his claimed error hinges on whether his wife's testimony was *inherently improbable*. As Melillo correctly notes, a judgment must be reversed if it is "based upon evidence inherently improbable." (*People v. Pearson* (1969) 70 Cal.2d 218, 221 (*Pearson*).) He functionally argues that his (now) ex-wife's testimony is "inherently improbable" because her view could have been partially obstructed, she was not wearing her glasses, and the television was on. He also points to her medication for depression and fainting after the incident. However, he makes no argument for why her depression medication or her fainting are relevant to the probability of her testimony; accordingly, we see no need to discuss either. Melillo attacks V.M.'s credibility by asserting she had a motive to fabricate because they were headed towards a divorce. Finally, in his reply briefing Melillo argues, for the first time, that his wife's lack of testimony to the lasting effects of child sexual abuse makes her testimony inherently improbable. We find these arguments unavailing.

The law upon which Melillo relies, *Pearson, supra*, does not advance his position. *Pearson* clarifies that " ' " '[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the *exclusive* province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " ' " (*Pearson, supra*, 70 Cal.2d at p. 221, italics added.) Further, " ' " 'testimony which merely discloses unusual circumstances' " ' " does not fall within the category of inherently improbable. (*Ibid*.) The jury was instructed to consider the credibility of witnesses, and to evaluate conflicting

4

evidence; given their conviction, it's clear they found V.M. more credible than Melillo. In arguing a motive to fabricate, Melillo asks us to do away with the jury's determinations regarding V.M.'s credibility, which is not the proper provenance of an appellate court such as ours.

While we cannot make determinations about his wife's credibility, we can evaluate whether her testimony was inherently improbable. We find nothing improbable about V.M.'s testimony. The testimony she offered aligned very closely with Melillo's own admissions to the police officers and on the stand. She observed Melillo's masturbating with his right hand and holding Child with his left; Melillo admitted his hand was inside his pants, his penis was erect, and he was holding Child. She heard Melillo tell Child he wanted to "cum" and directing her to open her mouth; Melillo admitted stating "I wish I could cum" and to subsequently telling Child to open her mouth. Melillo himself confirmed that his testimony lines up almost identically to his wife's. Melillo identifies the primary differences between their accounts as: (1) whether he said, "[c]ome on, [Child]. I need this," and (2) whether he was masturbating. What Melillo cites as conditions that make V.M.'s testimony inherently improbable—her glasses or lack thereof, the thickness of the partially open curtains, and the sound of the television—do not negate the extraordinary similarities between their testimony. His wife's silence on the lasting psychological effects of child sexual abuse has no bearing on the inherent probability of what she observed and testified to.

Accordingly, we conclude V.M.'s testimony was not inherently improbable.

2. *Statements Melillo Made to the Police Were Properly Admitted*

Melillo moved to exclude the statements he made to the police outside his home and at the police station, asserting they were obtained in violation

of his Fifth and Sixth Amendment rights.  Melillo argued that he should have received his *Miranda* warnings at the time police developed probable cause to arrest him and, following that logic, anything Melillo said after the officers developed probable cause should be suppressed.  The court below denied Melillo's suppression motion because the conversation outside his home was "not a custodial interrogation."  The court took into account that Melillo was not handcuffed, the officers were not physical with him, and the interaction was casual.  Melillo further argued that all of the statements he made at the police station should be suppressed in spite of his *Miranda* waiver.  The court ruled the statements from the police station were admissible because he exhibited "the complete ability to independently decide what he wanted to do," noted that he "did initially invoke briefly," and that he was not "badgered into backing away from the invocation."  Melillo renews these arguments regarding his statements on appeal.

  a. *The Interview at Melillo's Home and Custodial Interrogation*

  Melillo argues that the trial court erred in finding he was not subject to custodial interrogation under *Miranda* while he spoke with police outside his home.  Whether a defendant was in custody for *Miranda* purposes presents a mixed question of law and fact.  We defer to the trial court's factual findings when supported by substantial evidence and decide independently whether Melillo was subject to custodial interrogation within the meaning of *Miranda*. (*People v. Davidson* (2013) 221 Cal.App.4th 966, 970 (*Davidson*).)

  If a defendant makes statements while under custodial interrogation without being advised of his rights under *Miranda*, his statements cannot be used as evidence to establish guilt.  (*Berkemer v. McCarty* (1984) 468 U.S. 420, 429.)  But an officer's obligation to administer *Miranda* warnings attaches only when the person questioned is in custody.  (*Stansbury v.*

6

*California* (1994) 511 U.S. 318, 322.) The relevant inquiry when considering whether an interrogation was custodial is whether a " 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.' " (*Howes v. Fields* (2012) 565 U.S. 499, 509.) In making that determination, courts consider the totality of the circumstances, including: " '(1) whether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning.' " (*Davidson, supra*, 221 Cal.App.4th at p. 972.) Additional factors include "whether the officer informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement, whether the police were aggressive, confrontational, and/or accusatory, and whether the police used interrogation techniques to pressure the suspect." (*Ibid.*; see also *People v. Bejasa* (2012) 205 Cal.App.4th 26, 35-36.)

Melillo argues that he was in custody when he spoke to officers on his lawn because a reasonable person in his position would not have felt free to leave. He cites to his own suppression motion as evidence that police instructed him to sit on the ground and that he was not free to leave. We note, however, that such an instruction does not appear in either the transcript of the interview police conducted with Melillo outside his home, or the body worn camera footage of the interview.

Melillo summoned emergency services to his home to handle a medical emergency after his wife fainted. During his interactions with police officers, Melillo apparently felt sufficiently free to request to move their conversation to the shade, which the officers agreed to. He was not in a patrol vehicle. He was not inside a small room with officers blocking his exit; he was not

handcuffed or otherwise restrained.  He was outside and was free to move to a more comfortable area and position.  He spoke with two officers while sitting in the grass outside his home before one officer left to make a call.  The single remaining officer was not confrontational and asked him open ended questions about what happened.  Collectively, the police spoke to him for approximately ten minutes before arresting him and ending the interview.  The nature of the interaction was so casual, in fact, that the arrest seems to have taken Melillo by surprise; in response to the instruction from officers to put his hands behind his back, Melillo asked, "I'm being arrested?"  Given these facts, we must conclude that the conversation in front of his home did not constitute a custodial interrogation.

      b.  *Melillo Waived His* Miranda *Rights at the Police Station*

After the police officers arrested Melillo, they transported him to the police station.  The interrogating police officer advised Melillo of his *Miranda* rights and Melillo invoked his right to counsel.  Following his invocation, the officer provided details to Melillo regarding his transfer to the downtown facility to be booked:

> "OFFICER 2:  Will's fine, 'kay.  Um, I'm just gonna read to you verbatim, okay.  William, you have the right to remain silent, do you understand?
>
> MELILLO:  Yes.
>
> OFFICER 2:  Anything you say may be used in court; do you understand?
>
> MELILLO:  Yes.
>
> OFFICER 2:  You have the right to the presence of an attorney before and during any questioning, do you understand?
>
> MELILLO:  Yes.
>
> OFFICER 2:  If you cannot afford an attorney, one will be appointed for you free of charge before any questioning if you want, do you understand?
>
> MELILLO:  Yes.

OFFICER 2: Okay. William, with that in mind, do you wish to tell me what happened today, this morning?

MELILLO: I would like to speak to an attorney first.

OFFICER 2: 'Kay. Um, unfortunately if that's the - if that's - again, your right. That's what you want to do, I can't ask you anymore questions about it, okay.

MELILLO: Okay.

OFFICER 2: Um, at that point, uh, you are gonna be taken downtown where you'll get booked in, okay. And if at any point you change your mind, you wish to, you know, discuss it with me. But if you invoke your right to an attorney which is your right.[3]

MELILLO: Can I, uh, at any time ask for one?

OFFICER 2: So, you - you -

MELILLO: I've never been arrested.

OFFICER 2: Right. So -

MELILLO: I just want this day to end. This nightmare to end.

OFFICER 2: Okay.

MELILLO: This going on and on. I - I don't want it. Here's my concern and I'm sorry if I'm -.

OFFICER 2: Okay. So, the only issue right is - is to discuss kind of the case. To go about it, right. There's really not much that I can talk to you about it. Other than telling you. Just because you're asking for an attorney, okay. I am respecting your rights.

---

[3] Melillo argues this statement was coercive and an attempt to get him to change his mind about wanting counsel. He argues the implication is that "if Melillo talked, he wouldn't be taken 'downtown' or 'booked.'" In contrast, Melillo acknowledged below that the officer "kept trying to explain to him what was going to happen to him." The court found Melillo was not "badgered into backing away from the invocation." We do not reweigh evidence or substitute our own factual findings in place of the trial court's and consequently reject Melillo's argument that this description of the next step in his arrest was impliedly coercive. (See *People v. Brown* (2014) 59 Cal.4th 86, 106.)

MELILLO:       Yes.

OFFICER 2:     Okay. I'm not trying to infringe on your rights if that's -

MELILLO:       I understand that sir and I'm not - but, uh, my question is - if we start talking and at any time, I feel I need an attorney, can I say, stop?

OFFICER 2:     100%.

MELILLO:       Okay.  Then for now, we'll talk. . . .

OFFICER 2:     Okay.

MELILLO:       Um, so -.

OFFICER 2:     So, let me just re-read you your rights just to clarify that *you're not asking for an attorney at this point*.

MELILLO:       [unintelligible]

OFFICER 2:     Okay.  I'll read it to you again, okay. William, you have the right to remain silent, do you understand?

MELILLO:       Yeah.

OFFICER 2:     Okay, anything you say maybe [*sic*] used in court, do you understand?

MELILLO:       Yes.

OFFICER 2:     You have the right to the presence of an attorney before and during any questioning, do you understand?

MELILLO:       Yes.

OFFICER 2:     If you cannot afford an attorney, one will be appointed for you free of charge before any questioning if you want.  Do you understand?

MELILLO:       Yes.

OFFICER 2:     Okay.  Um, with that in mind, okay, now *that you are waiving your right to an attorney*. You are saying that you do wish to speak to me at this time?

MELILLO:       *I'll speak to you at this time, yes.*"  (Italics added.)

A defendant's statements to police during a custodial interrogation are inadmissible to establish his guilt unless the defendant knowingly and intelligently waived the rights to remain silent and to the presence and

10

assistance of counsel.  (*Miranda, supra*, 384 U.S. at p. 475.)  An interrogation must end if the suspect indicates, in any manner, the desire to remain silent or to consult an attorney, and any statement obtained thereafter may not be admitted against the accused during trial.  (*Fare v. Michael C.* (1979) 442 U.S. 707, 709.)  "[A] suspect who desires to waive his *Miranda* rights and submit to interrogation by law enforcement authorities need not do so with any particular words or phrases.  A valid waiver need not be of predetermined form, but instead must reflect that the suspect in fact knowingly and voluntarily waived the rights delineated in the *Miranda* decision."  (*People v. Cruz* (2008) 44 Cal.4th 636, 667 (*Cruz*).)  "A suspect's expressed willingness to answer questions after acknowledging an understanding of his or her *Miranda* rights has itself been held sufficient to constitute an implied waiver of such rights."  (*Ibid.*)  " 'In general, if a custodial suspect, having heard and understood a full explanation of his or her *Miranda* rights, then makes an uncompelled and uncoerced decision to talk, he or she has thereby knowingly, voluntarily, and intelligently waived them.' [Citations.]"  (*People v. Parker* (2017) 2 Cal.5th 1184, 1216 (*Parker*).)

After Melillo was properly admonished of his *Miranda* rights at the station, he invoked his right to counsel.  Then, he elected to continue speaking with police and inquired if he could invoke later.  Not only did the interrogating officer remind Melillo that they could not continue speaking about the case if he asked for an attorney, when Melillo expressed a desire to continue the interrogation, the officer provided a second *Miranda* advisement.  Finally, the officer asked candidly if Melillo wished to continue speaking with him having waived his *Miranda* rights.  Melillo now argues that he did not waive his right because he did not "ever say anything remotely resembling, 'I don't want an attorney.' "  While Melillo's waiver was

11

not of some "predetermined form," it was nevertheless a waiver. (*Cruz, supra*, 44 Cal.4th at p. 667.) He expressed a "willingness to answer questions after acknowledging an understanding of his . . . *Miranda* rights." (*Ibid.*) He expressly elected to continue the interrogation and forgo his right to have counsel present when he said, "for now we'll talk." Melillo heard *two* full explanations of his *Miranda* rights and made an " 'uncompelled and uncoerced decision to talk.' " (*Parker, supra*, 2 Cal.5th at p. 1216.) We must therefore conclude he " 'knowingly, voluntarily, and intelligently waived' " his *Miranda* rights. (*Ibid.*)

We conclude the trial court did not err in admitting the statements Melillo made to police at the police station.

3. *The Trial Court Properly Excluded Hearsay Statements*

After the court denied his motion to suppress the statements Melillo made to the police, he argued that additional excerpts should be included because he believed the statements to be exculpatory. He asserts on appeal that the court erred in denying his motion to include the excerpts. Below, Melillo argued to include: (1) officers telling Melillo his "wife is saying one thing" and asking for his "side of the story"; (2) Melillo's statement that he didn't want to "say anything bad" about his wife; (3) protestations of innocence and statements regarding his wife's health and credibility; and (4) additional protestations of innocence, desire to use the restroom, empathetic statements from the officer, and an explanation for why his hands were often in his pants.

Melillo argued for these out-of-court statements "to come in for [their] truth." He argued the hearsay statements should be admissible under a "present state of mind" exception, the "past recollection recorded" exception, or the official record exception. In the alternative, he argued that the

12

statements should come in under the rule of completeness, or through judicial notice.  The court excluded the statements, finding no hearsay exceptions applied and the statements were not subject to the rule of completeness.

Now, Melillo asserts that the "trial court and the Deputy District Attorney used an obscure and little-known offshoot of the hearsay rule to exclude [him] from presenting to the jury the exculpatory portions of the body-cam footage."  He centers his argument on whether the court properly applied the evidentiary rule of completeness to evidence he believed to be exculpatory.

"We review the trial court's determination as to the admissibility of evidence (including the application of the exceptions to the hearsay rule) for abuse of discretion [citations] and the legal question whether admission of the evidence was constitutional de novo [citation]."  (*People v. Mayo* (2006) 140 Cal.App.4th 535, 553.)

Evidence Code section 356, "sometimes referred to as the statutory version of the common law rule of completeness" (*People v. Parrish* (2007) 152 Cal.App.4th 263, 269, fn. 3), provides as follows:  "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which *is necessary to make it understood* may also be given in evidence."  (Evid. Code, § 356, italics added.)

"The purpose of [Evidence Code section 356] is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed.  [Citation.]  Thus, if a party's oral admissions have been introduced in evidence, he may show other

13

portions of the same interview or conversation, even if they are self-serving, which 'have some bearing upon, or connection with, the admission . . . in evidence.' " (*People v. Arias* (1996) 13 Cal.4th 92, 156; accord, *People v. Melendez* (2016) 2 Cal.5th 1, 25.)  Melillo made no argument below and makes no argument here regarding how his protestations of innocence in the body worn camera footage was necessary to make the remainder of the footage understood or to correct any misleading impression.  The court did not err in refusing to admit Melillo's self-serving hearsay statements when they were not necessary to understand the footage or to correct any misleading impression.

We turn, next, to the related argument Melillo makes regarding the "little known offshoot of the hearsay rule."  The People introduced the statements Melillo made pursuant to Evidence Code section 1220, which provides:  "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party . . . ."  (Evid. Code, § 1220.)  Melillo's statements to the police were admissible by the People as a statement offered against the declarant, Melillo, in an action to which he is a party, his criminal trial.  The remaining statements, inclusive of his protestations of innocence, are not admissible under the same rule when Melillo offers them himself.  The statements Melillo argues "should have been presented to the jury consisted of self-serving hearsay not otherwise admissible at trial.  (See Evid. Code, § 1220 [to qualify as a party admission, a hearsay statement must be introduced *against* the declarant].)  Defendant was free to present this information by taking the stand himself."  (*People v. Gurule* (2002) 28 Cal.4th 557, 605.)  Melillo *did* take the stand himself and, to that end, the statements Melillo made in the footage were cumulative of testimony he gave at trial.  Any

14

possible error from excluding Melillo's additional statements to the police would be "harmless, because the excluded evidence was merely cumulative of properly admitted evidence." (*People v. Helton* (1984) 162 Cal.App.3d, 1141, 1146.) Accordingly, we conclude there was no error in excluding the statements.

4. *Substantial Evidence Supports the Jury's Implied Finding that Melillo Touched Child with the Requisite Intent*

Finally, Melillo argues that the record does not contain substantial evidence that he touched Child with the requisite intent to arouse, appeal to or gratify his lust, passions, or sexual desires.

On appeal, we presume the judgment is correct (*People v. Giordano* (2007) 42 Cal.4th 644, 666) and Melillo, as the appellant, has the burden of establishing reversible error. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364). When an appellant like Melillo challenges the sufficiency of the evidence, " 'the power of an appellate court *begins* and *ends* with the determination as to whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, which will support [the challenged findings], and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the jury. It is of no consequence that the jury believing other evidence, or drawing different inferences, might have reached a contrary conclusion.' " (*People v. Ghipriel* (2016) 1 Cal.App.5th 828, 832.) To be considered "substantial" for purposes of appellate review, the evidence "must be more than evidence which merely raises a strong suspicion . . . as mere suspicion will not support an inference of fact." (*People v. Martin* (1973) 9 Cal.3d 687, 695.) " 'A reviewing court neither reweighs evidence nor

15

reevaluates a witness's credibility.' " (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).)

Under section 288, subdivision (a), any touching of a child under the age of 14 is a felony offense only if the touching "is accompanied by the *intent* to arouse or gratify the sexual desires of either the perpetrator or the victim." (*People v. Lopez* (1998) 19 Cal.4th 282, 289; accord, *People v. Panah* (2005) 35 Cal.4th 395, 488; *People v. Martinez* (1995) 11 Cal.4th 434, 442, 452.)

" 'Because intent for purposes of . . . section 288 can seldom be proven by direct evidence, it may be inferred from the circumstances.' " (*People v. Villagran* (2016) 5 Cal.App.5th 880, 891.) Even though " '[e]vidence of a defendant's state of mind is almost inevitably circumstantial,' " we are mindful that " 'circumstantial evidence is as sufficient as direct evidence to support a conviction.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.) To determine whether Melillo acted with the requisite intent, "all the circumstances are examined." (*In re R.C.* (2011) 196 Cal.App.4th 741, 750.)

Here, V.M. awoke to the sounds of Melillo moaning and Child yelling. She described Melillo masturbating with his right hand on his penis pulled out of his pants, while grasping Child with his left hand. She heard him talking about orgasming and directing their two-year-old daughter to open her mouth while pulling her closer. She heard him tell Child that he really needed this, and he explained that he'd failed to achieve orgasm earlier in the morning. Melillo himself largely corroborated his wife's account, though he denied masturbating while touching Child. Further conversations with police revealed that he'd developed erections while cuddling and playing with Child before, which he seemed to blame on a lack of intimacy with his wife.

Viewed in the light most favorable to the judgment this evidence, and the reasonable inferences from this evidence, fully substantiates the finding

16

that, while Melillo grabbed Child while masturbating on the couch and spoke of ejaculating into her mouth, he had the intent to arouse, appeal to, or gratify his lust, passions, or sexual desires for purposes of section 288, subdivision (a).

In his effort to demonstrate a lack of substantial evidence to support a finding of the requisite intent, Melillo relies on evidence in the record that potentially discredits, contradicts, or is inconsistent with the evidence described above. In doing so, Melillo asks us to discredit admissible evidence, weigh admissible evidence, and infer from admissible evidence facts that do not support the judgment—which we may not do. (*Albillar, supra*, 51 Cal.4th at p. 60.)

For these reasons, Melillo did not meet his burden of establishing reversible error.

## DISPOSITION

The judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

DATO, J.

BUCHANAN, J.

17